

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-09-00296-CR

ROBERT CRUZ LOZANO                                                    APPELLANT

V.

THE STATE OF TEXAS                                                          STATE

----------

### FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

----------

## OPINION

----------

### I. Introduction

A jury found Appellant Robert Cruz Lozano guilty of the murder of his wife, Virginia Lozano, and sentenced him to forty-five years in prison. The trial court entered judgment accordingly. Appellant raises seven issues challenging the sufficiency of the evidence, several of the trial court's evidentiary rulings, and a portion of the trial court's jury instructions.

### II. Factual Background

On July 6, 2002, Appellant's wife, Virginia (Viki) Lozano, died of a multiple-trauma gunshot wound in the bedroom of their Denton residence, where they lived with their eleven-month-old son, Monty, and Viki's mother. At that time, Appellant was a detective with the Denton Police Department.

## A. Appellant's Written Statements

In a voluntary statement given two days after his wife's death, Appellant gave a lengthy, detailed description of the activities leading up to the shooting. He explained that he and his wife had gone out the evening before to celebrate their sixteenth wedding anniversary, had come home, played with Monty, and gone to bed. The next afternoon, he, Viki, and Monty went to Target and arrived back home around 4:30 p.m. According to Appellant, Monty went to bed around 7:00 p.m. Appellant then,

> decided to play a computer game called either Mo-Huang or Ma-Huang [sic]. It is a game of puzzle pieces which require that they all be removed in order to win. Viki chose to lie in bed and watch t.v. She had not felt well for the last week. . . . I played the computer game for nearly an hour when I decided that I would take a moment to clean my service weapon. I currently possess a Glock 9mm handgun. Viki and I had made plans to shoot my gun at the Denton P.D. firing range the following day. . . .
>
> I went into the kitchen and I grabbed a section of the day's newspaper. . . . I returned to the bedroom and I unfolded the paper and laid it on the bed opposite where Viki was lying. . . . I placed my gun cleaning box on the paper and then I removed my gun from my duty shoulder holster. I removed the fully loaded magazine from the gun and I placed it atop the paper. I then also removed the live round from the gun's chamber. I left the gun with its slide locked open. I asked Viki if she didn't mind that after I cleaned the gun if I could go to tan. She offered to clean my gun while I went to tan so that we would have a little more time together when I returned. I told

2

her not to worry about it since it would take only a few moments to clean the gun. As I started to take the rags from the cleaning box, I changed my mind and decided to go and tan first and then return to clean the gun. I didn't want to have the residue of the cleaning fluids on my hands when I went to tan. She again offered to do it for me and [I] told her to relax and watch whatever it was she was watching. . . . I believe that it was nearing 8:30 p.m. when I left the house. I tanned for a twenty-minute session and as I was leaving, I asked the kid at the front desk how his Fourth of July celebration had gone for him. He told me that he had spent it with some friends and had a good time. . . .

When I returned home which was approximately 9:00 p.m., I noticed that Viki was lying somewhat awkwardly on the bed. She was facedown and slightly to the left of her left hip. I asked her if she was feeling ill and I received no response. As I continued to walk around to her side[] of the bed, I again asked her if she was okay. I then noticed that the newspaper and the cleaning box had been moved from where I had left it. I think I may have again asked if she was okay but this time it was much more frantically. I raised her up and as if it were in slow motion, her listless body fell backward onto the pillow nearest the metal headboard. I saw her tongue hanging from her mouth and the color of her face was extremely pale. I looked down where she had laid and I noticed a lot of blood on the sheets. I grabbed her by her shoulder and I screamed for her to respond. She remained completely lifeless as I repeatedly shook her to have her regain consciousness. When I saw the hole in the middle chest portion of her nightgown, I knew that she had been shot. I then thought only to run to the bedroom telephone to call 9-1-1. . . . I begged that she have ambulance personnel come quickly. My thought then suddenly turned toward my son. . . . I ran to his bedroom which is located across the house and I opened his door. I immediately picked him [up] and it was apparent that I had scared him since he began to cry. He was actually sound asleep. I ran back to the telephone in the bedroom and I again spoke with the dispatcher. I recall her asking whether she was still breathing and I think I replied that I didn't know. She asked that I begin CPR until the paramedics arrived. I think that I placed Monty down on the floor near the telephone as I ran back to Viki's side of the bed. I started to cross my left leg over her body for better leverage when massaging her chest and then blowing in her mouth. I then noticed the gun which I picked up and tossed to one side. Although I did not straddle her body, I did begin CPR

3

procedures from her side of the bed. I know that I was failing to do it properly because I was overcome with emotion. I begged her not to die and not to leave us alone. Moments later, I think I ran back to the phone to tell the dispatcher that she was either not breathing or that she was unconscious (perhaps neither or both). . . . I left the front door wide open to help the paramedic's entry into the house and I believe that I turned on several outside lights. I'm not sure what happened after this. . . .

      . . . .

      I believe that Viki's untimely death was purely accidental. She had been so happy and had found great joy in the life of our newborn child. . . . Viki was not suicidal. She had no reason to be so. . . .

      I was asked whether Viki ever suffered from depression. My answer is "yes". When her father ha[d] passed away several years ago, I hadn't actually realized how close they had been. She was tormented by his death from cancer and often cried for his absence from our lives. . . . Viki, herself, was ill for much of the last several years of our marriage. She suffered from a condition which involved long moments (days) of fatigue, listlessness, and an arthritic condition. She was also medically deemed a "free-bleeder". . . . This was our major concern after we decided to have our child. We knew that the possibility existed that she would not survive childbirth. Incredibly, Monty's birth went extremely well. However, the doctor discovered that she was torn from the inside as he passed through her vaginal canal. Her vaginal canal suffered a four to six inch tear which required stitching. . . . On the follow-up visit soon after Monty's birth, the gynecologist (Dr. Popov) discovered that the stitche[s] had torn and were no longer holding the vaginal wall intact. She did not order a second surgery fearing that Viki was too weak to survive it. It was requested that she be bedridden for almost two months and that failure to follow these instructions exactly would result in continued free bleeding from her vaginal tear. As it occurred, Viki heeded this advice as I was left to attend to Monty's every need. . . . Other than these two matters (her father's death and her inability to care for Monty during his early childhood), Viki never appeared overly depressed. She had everything to live for as she voluntarily took one year's leave of absence from school to be at home with Monty. . . .

At the time of Viki's death, Appellant was dating fellow detective Cynthia Waters. When Waters learned that Appellant's wife had died, she approached her supervisors, revealed her relationship with Appellant, and provided several statements. After learning of this, Appellant provided officials with a supplemental statement, explaining that his prior statement—that he and Viki had played with their son and then gone to bed after their anniversary dinner—was "incorrect." He explained that he actually left home that night (telling Viki he needed to go to the office), went to Waters's home for two hours, and then returned home.

## B. First Responders and Initial Investigation

*Captain Luke Scholl*

At 9:05 p.m. on July 6, 2002, paramedic and firefighter Captain Luke Scholl was dispatched to an emergency at 3800 LaMancha in the city and county of Denton, Texas. The dispatcher alerted all the responders to a gunshot wound and advised more than once that CPR had been started by the 911 caller. Captain Scholl arrived at 9:09 p.m. He testified that the victim's chest wound was directly where the palm of the hand would be placed to start CPR and that performing CPR for five minutes would cause a person to be out of breath. When Captain Scholl arrived, however, he saw a calm adult male (hereinafter Appellant) with no apparent blood on his hands or clothes standing on the front porch holding a child.

5

Captain Scholl testified that he entered a bedroom and found a female (hereinafter Viki) in her mid-thirties lying on her back on a bed, blood in the middle of her chest, with her right leg hanging off the side. She was not conscious or breathing. She was very cold to the touch and very waxy, which indicated that she had been dead "for quite some time." She was pale and had lividity in her right foot around the ankle area. Captain Scholl explained that lividity is the pooling of the blood that starts thirty to forty-five minutes after death, gives the body a mottling or blanched look, and begins in the lowest part of the body. "[L]ividity is an indication that [the person has been] deceased long enough that they are not salvageable, that their body has begun the process of breaking down." The first responders did not try any life-support techniques because the victim had sustained a gunshot wound to the chest, the body had observable lividity and was very cold to the touch, and the skin was waxy and clammy. Captain Scholl agreed on cross-examination that lividity can set in as early as twenty minutes after death but added that in his experience "that body had been there a lot longer than an hour."

*Firefighter and Paramedic Brandon Galbraith*

Firefighter and paramedic Brandon Galbraith also responded to the scene. When Galbraith asked Appellant if he had performed CPR, Appellant responded, "She's in there." Galbraith ultimately concluded that CPR had not been performed. Galbraith noticed that Viki had been shot and showed no signs of life; her hand was cold to the touch, her skin looked pale white, and she had

6

lividity in her right foot. Galbraith lifted Viki's right shoulder to check for lividity, which he saw in her lower right back. On cross-examination, Galbraith disagreed with a description in the official EMS patient form that he had rolled Viki's body to check for lividity. Based on lividity and Viki's skin temperature and appearance, Galbraith determined that she had been dead longer than an hour.

*Police Social Worker Richard Godoy*

Richard Godoy, a certified police officer and social worker with the Denton Police Department, testified that he and Appellant were colleagues and friends. Officer Godoy described Lozano as "Mr. GQ," very polished, and obsessed with neatness and looking good. At the scene, Appellant looked "real polished" and "like he had just got out of the shower, ready to go take some pictures." Appellant told Officer Godoy that he had left his gun on the bed and had gone to the tanning salon; he stated, "[Y]ou know how Viki likes to tinker with things and she's always doing things for me, and maybe she wanted to clean my gun for me while I was gone." In Officer Godoy's opinion, Appellant's statements that he had tried to revive Viki with CPR seemed inconsistent with his clean appearance. Officer Godoy testified that Appellant's facial expression was a forced grimace that looked like he was trying to imitate crying. On cross-examination, Officer Godoy acknowledged that people grieve differently and that police officers are trained to control their emotions.

*Chief Deputy Sheriff Lee Howell*

7

Lee Howell testified that he was presently the Chief Deputy Sheriff of Denton County but that in 2002 he had been a lieutenant in the Denton Police Department and supervised Appellant.[1]  After arriving at the scene, Chief Deputy Howell contacted the Texas Rangers to help conduct the investigation due to Appellant's position.[2]  The chief deputy testified that Appellant appeared to be more nervous than upset; appeared to be worried about what law enforcement was doing; and never made eye contact with, or spoke to, him.

Chief Deputy Howell used photographs to describe the crime scene—the deceased lying face up on the bed, a gunshot wound in her chest, her right leg hanging off the bed, and a considerable amount of lividity in her lower right leg and foot.  Also on the bed was a single sheet of newspaper, a Glock pistol, a brown box that contained gun-cleaning supplies and tools, a dishtowel and a pair of white athletic-type socks.  The chief deputy testified that, due to the location of this newspaper sitting on top of the folded-back bedspread and the location of the other items on the bed, the scene appeared to be staged.  It is unusual for someone to clean a gun on a bed, but even more than that, it did not look as if someone had actually cleaned the gun on the bed; instead it appeared that "someone had come in afterwards and put the items in place."

---

[1]Chief Deputy Howell testified that he had either investigated or supervised several hundred major crime scenes.

[2]The Texas Rangers are the investigative branch of the Texas Department of Public Safety, and its primary function is to assist other agencies in their investigations when asked.

Chief Deputy Howell also testified that he had cleaned firearms many times before and that he did not know anyone who would soak a gun in as much oil as this one had been. It appeared that someone "had just taken the spray can and held the gun and just sprayed it down, you know, all over, which would be an odd way for me to do it, and I don't know of any other people that clean guns that way." He testified that the pair of dirty socks on the bed did not appear to have any oil or gun residue on them and appeared out of place. They did not look like they had been used in the cleaning process. Chief Deputy Howell testified that Viki's hands did not look like she had cleaned a gun or even sprayed it down with oil; her hands did not appear to have any oil or gun residue on them. He further testified that the only way to keep gun residue off one's hands during gun cleaning would be to wear gloves and that no gloves were found in the bedroom. He testified that he had personally observed the onset of lividity in at least six deceased individuals and that, in his experience, lividity usually did not become visible in less than an hour and a half. He later acknowledged having heard in training that it could set in after thirty minutes.

Chief Deputy Howell testified that when he read Appellant's voluntary, written statement, he became more convinced that Appellant was not telling the truth. The chief deputy noted several inconsistencies between Appellant's statement and the crime scene evidence. For one, the level of lividity in Viki's body indicated that Appellant's time frame regarding his trip to the tanning salon "should have been a little bit longer" than the forty to forty-five minutes Appellant

9

estimated; there had to be enough time for Viki to begin cleaning the gun, shoot herself, and then time left for lividity to set in. Further, Appellant described finding Viki upright but "facedown" (and demonstrated to Trooper Murphree how Viki was upright with her face hanging down), but there was no lividity in her face, and instead, her face was very pale. Moreover, Appellant's obsession for neatness, cleanliness, and appearance were inconsistent with cleaning a gun on the bed. Also, Appellant's statement that Viki was ill that night was inconsistent with Viki volunteering to clean the gun. Although Appellant described performing CPR, there was no blood on Appellant or his clothing. Further, Appellant was trained in CPR and should have known that Viki's body needed to be on a flat surface like the floor to effectively implement CPR. If Appellant performed CPR, it would have been for less than a minute (based on his conversation with the 911 operator), and police officers are trained that once CPR is initiated it should not be stopped until paramedics arrive. Chief Deputy Howell also noted that Appellant's first statement to officials omitted the relevant fact that he had a mistress, and the existence of an affair could be a very stressful situation that could show a motive for homicide.

On cross-examination, Chief Deputy Howell acknowledged that neither he nor any other officer photographed Appellant's hands nor tested them for

10

gunshot residue that night.[3]   When asked why Appellant's car was not impounded and the house sealed off, the chief deputy stated that, if he had it to do over, he would do it differently.  He explained that they were trying to minimize the disruption to the family and that initially they had no reason to believe that anything outside of the main bedroom suite and the immediate surrounding area had any evidentiary value.

*Captain Jeffrey Allen Wawro*

Jeff Wawro, a captain in the Denton County Sheriff's Office, was an investigator with the police department (and had investigated 250 to 300 cases a year for fourteen years) and assisted in the instant investigation.  He testified that he did not see any evidence of blood on Appellant's hands or clothing or on the baby's clothing, even though performing CPR on a chest wound would have been messy.

The investigative team photographed the crime scene before touching anything, thereby freezing it in time.[4]  Captain Wawro testified that "the first thing that jumped out" was that there was a gun-cleaning kit and newspaper on top of the bed.  He explained that "[i]t's pretty uncommon for us" to clean a gun in the

---

[3]He further explained on re-direct that the gunshot residue kits they had at the scene had expired and that he had heard that Appellant had already washed his hands, which would have washed away any trace of gunshot residue.

[4]Captain Wawro testified on cross-examination that the investigative team began taking pictures approximately two hours after the police arrived at the scene.

11

house, much less on a bed. He also found it unusual that Appellant was preparing to clean his gun before—rather than after—going to the gun range; afterward it would be dirty from being fired. He also found the excessive amount of oil on the gun to be unusual. Captain Wawro was the first to pick up the gun, and it was "dripping with oil."[5] He explained that a Glock has a plastic finish, that there are only a few metal parts, and that only a couple of drops of oil are needed to keep it clean because "[o]il collects dirt and dust, and then the weapon will not clear and function." Captain Wawro testified that he photographed Viki's hands and that some specks of blood and residue—but no dripping oil—can be seen on her right hand. "It would be impossible, I would believe, to be able to hold this weapon, as dripping with oil as it was, without having gun oil on your hand." Viki's left hand had no signs of oil and less blood than the right hand. Referring to crime-scene photographs, Captain Wawro described how he concluded (based in large part on the blood evidence) that the comforter on the bed had to have been moved after Viki had been shot and that the newspaper, gun, and Viki's arm had to have been placed on top of the comforter.

Captain Wawro testified that Viki had to be lying on her left side when shot. As the medical examiner concluded, the spent bullet passed through her heart and, as it exited her left side, pushed the skin against a firm surface (in this case

---

[5]Captain Wawro agreed on cross-examination that no oil is apparent in certain photographs of the weapon on the newspaper. On re-direct, he testified that a rag hides the majority of the oil in certain photographs but that another photograph provided a much clearer image of the overspray on the gun.

12

the mattress), causing the bullet to remain inside her pajama top. The captain and the prosecutor then demonstrated how Viki's body and the gun had to be positioned in light of the wound, the track of the bullet, and the firing distance of three to six inches. Captain Wawro testified that he had never "pointed a gun [lying] down on [his] side holding it like this," that this would be "[p]retty hard to maneuver," and that a person would probably not load the weapon before cleaning it.

The captain testified that if Appellant's statements were true—that he found Viki "facedown and slightly to the left of her left hip"—there should have been some lividity in her face and none in her back. Viki had no lividity in her face, but clear lividity in her foot and back. Although he had seen many bodies with lividity, he had never seen lividity appear as early as thirty to forty minutes.[6]

The captain testified that blood transfer was found on a "Break-Free" can of oil, found between the newspaper and the gun-cleaning kit. DNA testing showed the blood to be Viki's. A fingerprint was found within the blood, but it could not be identified (although the first responders and investigative team were excluded because they all wore gloves). Captain Wawro testified that, assuming the print was from human skin, someone moved the can after Viki was shot because "she would not be losing blood on a can unless it was after the shooting

---

[6]When Appellant's trial counsel asked whether Captain Wawro had any reason to dispute trained pathologists' opinions that lividity can set in as early as twenty to thirty minutes, the captain responded, "[o]ther than the fact that I've never seen it happen, no I cannot dispute that."

13

had occurred." He further testified that, due to the nature of the wound, it was highly improbable (although not impossible) that Viki was shot, got blood on her hand, and then picked up the can and moved it.[7]

Later testing revealed popcorn on Viki's body and trace amounts in her mouth, stomach, and in the bed; investigators did not look for popcorn at the scene, however, because a bowl was not found on the bed, and no popcorn was found on the floor or underneath the bed. Captain Wawro testified that, if Viki had risen from bed to return the bowl, the popcorn in her loose pajamas would have fallen. He also testified that it was unrealistic to think someone would eat popcorn while cleaning a gun and that it would be inconsistent for someone to snack on popcorn and then commit suicide.

Captain Wawro testified that, because a weapon had been fired, investigators "searched and searched" for the shell casing before moving anything but did not find it. After the body was moved, the investigators collected items off the bed "layer by layer" and finally found the casing in a bedspread wrinkle. Captain Wawro explained how the police later used the crime-scene photographs to determine that the casing had been lying under the gun-cleaning kit. The casing's location indicated that someone had placed the kit on top of the

---

[7]He testified on cross-examination that he was aware that dogs were on the bed when the police arrived but that he was not aware of a report that the dogs had been licking the body. The captain agreed that, if the dogs were licking the body, they might be inclined to lick the blood. He also agreed that, theoretically, the dogs could have caused the Break-Free can to roll.

casing. Captain Wawro testified that he prepared a hand-held sketch at the crime scene and then later tried to create a computer-aided drawing (CAD), but the software program he used was "archaic" and did not show all the dimensions that the photographs portrayed. As a result, the CAD drawing is incomplete and inaccurate, especially its depiction of the shell casing sitting above (instead of under) the gun-cleaning kit.

Captain Wawro summarized (based on the physical evidence) what had to have happened for Appellant's statement to be true: Viki would have picked up the weapon, loaded it, put a round in the chamber, oiled the weapon excessively, and laid on her left side, all while eating popcorn. She then would have pulled the trigger, shot herself, and then pulled the bedding back, pulled the newspaper over the bedding, and pulled the gun kit over the casing, before dying in an upright position, with blood pooling only out of her lower wound and not out of her upper wound.

On cross-examination, Captain Wawro agreed that the unfinished CAD diagram shows the shell casing to be above the gun-cleaning kit. He also acknowledged that neither his detailed report nor any of the other reports from 2002 documented that the casing was found beneath the gun-cleaning kit. Appellant's trial counsel then read the following statement from the report of Detective Jason Grellhesl: "The spent shell casing was located very close to where the body was found. I then picked up the gun cleaning kit." The captain

15

characterized this statement as inaccurate and noted that he was "familiar that a few of [Grellhesl's] lines were out of order."

After eliciting from Captain Wawro that the investigators had not disturbed the integrity of the environment, Appellant's trial counsel showed two photographs of the "same scene," and Captain Wawro agreed that there were differences in the photographs. For instance, in one photo the rag is seen on top of the newspaper and in the other, the rag is seen on the bottom corner of the newspaper. On re-redirect, Captain Wawro explained that the photographs demonstrated the process of moving, collecting, and then bagging evidence. He also explained that the camera's angle can affect a photograph. Captain Wawro testified that, in every diagram, the casing was listed as 32.5 inches from the wall. When asked whether there were any indications that the casing was moved from "this core area," the captain responded, "No. Obviously, we were searching around the perimeters." He further explained that evidence was moved to see if the casing was underneath, that when the casing was discovered it was photographed, and that there are no photographs of the casing being discovered in some other location.

*Detective Jason Grellhesl and Officer Craig Fitzgerald*

Detective Grellhesl testified that, upon entering the crime scene, he questioned why anyone would clean a gun on a bed or use such an excessive amount of oil. The detective testified that, when they began looking for the shell casing on the bed, the newspaper, the gun case, and the gun-cleaning kit had

16

been moved down to the foot of the bed, which had already been searched. The investigators then started trying to spread folds and creases out of the blanket. After the casing was found, Detective Grellhesl picked up the kit at the foot of the bed and handed it to another detective. He testified that the casing was under the fold of the blanket in the same spot where he had picked up the gun-cleaning kit, so the casing had to have been under the gun-cleaning kit. Detective Grellhesl testified on cross-examination that he omitted a step in his 2002 report when he stated that the bedding was examined, the casing was found, and then he picked up the gun-cleaning kit. But he explained that he actually removed the kit to the foot of the bed before the casing was found, and this was corroborated by a visual record.

Detective Grellhesl and Officer Fitzgerald searched the house and found no evidence of forced entry, no suicide note, and no additional relevant evidence other than the Target receipt from that day in one of the trash cans.

*Texas Ranger Tracy Murphree*

Ranger Murphree arrived at the crime scene around 11:00 p.m. He was part of the crime-scene team, and he took Appellant's voluntary statement. Upon entering the bedroom, he saw Viki lying on the bed with a great amount of blood on her left side; he also saw a gun-cleaning kit, a newspaper, and a handgun. His initial impression was that cleaning a gun is extremely messy and that it was absurd that anyone would consider cleaning a gun in the middle of a bed. In his opinion, someone inexperienced in gun cleaning would not begin the process by

17

herself. Someone experienced in gun cleaning would know how messy it is, would not have put that much oil on the gun, would not have put down only one thin sheet of newspaper, and would not have faced the barrel toward herself when charging the gun, i.e., getting the chamber ready to fire. He testified that there is no circumstance whereby the first step in cleaning a gun would be to load it. Further, it would take fifteen to twenty minutes to clean a gun "decently," and it would take as much as thirty minutes to "really get it clean." Ranger Murphree testified that he held Viki's hand in his gloved hands and did not see any oil or residue on them. Ranger Murphree testified that the popcorn residue found in Viki's mouth and stomach and inside her shirt and the bedding indicated that she had been eating popcorn. He testified, "You don't eat popcorn and clean a gun. Two reasons: Cross-contamination. You don't want to get salt in your gun, and . . . . [y]ou certainly don't want [oil] in your popcorn." Additionally, no popcorn bags were found near the body, a great deal of the popcorn residue would have fallen off if she had been walking around, and she would not have been physically able to collect any other "visible residue" after she was shot.

Ranger Murphree reiterated the medical examiner's finding that Viki was lying on her left side when she was shot. This finding was based primarily on the fact that Viki's left-side exit wound was "shored," meaning that she was lying against something (like a mattress) when the bullet exited her skin, causing it to stop and remain within her pajamas. He testified that the gunpowder on Viki's right cheek was consistent with her being on her left side in that the only part of

18

her face being subjected to the gunpowder was the right side. Ranger Murphree testified that he could not think of any reason why someone would lie on their left side and clean a gun held out three to six inches away. He further testified that, if Appellant's statement about Viki's body position were true—i.e., with her nose and the front of her face down over her left side—he would expect to see lividity in her face, chest area, and probably in her shoulders. He saw no lividity in Viki's face. He explained that, even considering Appellant's statement that he lifted her up and she fell back on the pillow, he still would have expected to see facial lividity because it would take quite a bit of time for it to drain and go all the way to the back of her shoulder. Thus, based on the lividity in her back and foot and the shored exit wound, Ranger Murphree believed that Viki was never "upright" as described by Appellant. Ranger Murphree testified that, in his experience, the onset of lividity can occur within thirty minutes to an hour of a person's death. In his opinion, the mid-ankle lividity noted by first responders indicated that "lividity ha[d] been existent" for an hour to an hour and a half earlier. Appellant's timeline—estimated to have been about forty-five minutes—was inconsistent with this evidence.

Ranger Murphree provided several reasons why he believed the crime scene was staged. First, the gaps in the blood seen on the bedding indicated that the bedding had been in contact with blood at one point and then pulled back. He explained that, "If it's soaking here, it doesn't skip an area and then continue to soak here. It would be a continual soaking through the material. It

19

can't jump over part of the material and continue to soak up through." Ranger Murphree testified that the newspaper was found on top of a fold in the comforter and that, because the blood was found underneath the paper (which soaked up into the newspaper), "[t]he blood's there before the newspaper's there." He also testified that the unidentified fingerprint found in Viki's blood on the Break-Free can indicated that someone contacted Viki's blood, used the can to spray the gun with oil, and then placed the can on the bed.

Ranger Murphree explained how the crime scene was processed and photographed. He testified that when investigators discovered the shell casing, they did not immediately recognize that it had been under the gun-cleaning kit (because the kit and other items had been moved to the bottom of the bed). He explained that, by using the photographs to obtain reference points (such as the headboard and patterns on the bedding), they determined the location of the casing and the kit within a couple of inches. Investigators determined that the shell casing was underneath the cleaning kit and that the gun was fired before someone (other than the deceased) placed the cleaning kit there.[8]

Ranger Murphree testified that the studies he had read indicated that between 97% to 99% of wounds caused by firearm suicides are contact wounds,

---

[8]Ranger Murphree did not believe that examining the bedding somehow caused the casing to move under the box because the box was big and fairly heavy, and the investigators were very meticulous in moving things.

20

meaning that the muzzle is up against the person's skin.[9] Here, the weapon was held out to the side anywhere from three to six inches. Assuming suicide, Ranger Murphree would have expected the bullet to have traveled "from midline to midline" and contact to have been "much more straight [i]n," rather than exiting on Viki's side. In Ranger Murphree's opinion, it seems inconsistent to clean a gun before killing yourself. Ranger Murphree testified that "[i]f Appellant's statement is true, based on the evidence, there's got to be a series of improbable and impossible things take place."

On cross-examination, Ranger Murphree agreed that a person could "quick clean" a gun in a few minutes. He acknowledged that the Glock handgun was the subject of a lot of debate in the law enforcement community because it has fewer safety features than other guns. He agreed with defense counsel's statements that accidents can happen when cleaning a Glock and that "if you eject the round in the chamber first and then eject the magazine and then release the trigger, you've just fired that weapon."

*Officer Rachel Fleming*

Police officer Rachel Fleming (formerly Rachel Key) testified that when she entered the bedroom at the scene, she saw Viki's body. She also saw multiple lapdogs hanging around on the floor. She saw at least one of the dogs get on

---

[9]Ranger Murphree agreed on cross-examination that he obtained his statistics from Dr. DiMaio and that Dr. DiMaio's book states that a small but significant number of suicides can be committed at an intermediate gunshot range, which is generally accepted to be three to six inches.

21

the bed; he was positioned down towards the area where Viki's left knee was bent. She did not see the dog "do anything else" before it jumped down. Other officers confined the dogs in the master bathroom. Officer Fleming testified that the crime-scene photographs do not indicate that dogs walked on the newspaper or had been on any of the kit area. Officer Fleming testified on cross-examination that she did not remember telling prosecutors a year later that dogs were licking Viki's body but acknowledged that she must have when presented with a prosecutor's notation that she had stated such.

## C. Additional Aspects of the Investigation

### *James Willingham*

Certified computer forensics examiner James Willingham testified that he examined the computer located at Appellant's residence. He found that the game Mahjong started running on July 2, 2002, that it had been played periodically through July 4, 2002, but that it had not been touched again until after Viki's death on July 6. Willingham testified that the computer had not been used for any purpose between 6:00 and 9:00 on July 6 (the night of the shooting), and any claim that a computer game had been played between 7:00 and 8:00 that night would be false.

### *William Addington*

William Addington testified that he worked at the tanning salon used by Appellant. Salon records showed that in the summer of 2002, Appellant tanned

May 13, 20, 28; June 8; and July 5 and 6.  Appellant tanned for twenty minutes on July 6.

**D.  Medical Evidence**

*Gary Sisler, D.O.*

Dr. Gary Sisler, a deputy medical examiner for Tarrant, Parker, and Denton counties, conducted Viki's autopsy the day after the shooting.  Dr. Sisler testified that the cause of death was a gunshot wound to the chest; specifically, the bullet entered the chest from a distance of three to six inches and traveled front to back and downward right to left; it traveled through her heart, left lung, diaphragm, and spleen and exited on the left side of her chest.  The exit wound was "shored," meaning that the bullet pushed the skin against a surface and caused the red abrasion around the wound.  Based on the shored wound, Dr. Sisler believed that Viki was lying on her left side on the mattress when the shooting occurred.

Dr. Sisler testified that the manner of death was undetermined, meaning it could have been a suicide, an accident, or a homicide.  He based his conclusion on the autopsy; he made his finding before DNA testing had been conducted, before knowing all the results of the trace evidence collection, and without considering the circumstances surrounding the shooting.  He explained that it

23

was the jury's role and not within the medical examiner's realm to go beyond the autopsy.[10]

Dr. Sisler testified that a significant factor in his indeterminate finding was the firearm examiner's estimate that the muzzle-to-target distance was three to six inches, which was consistent with the powder tattooing Dr. Sisler saw on the right side of the entrance wound. Dr. Sisler explained that, at that distance, it was neither a contact nor a distance wound. Thus, it was anatomically possible either for Viki to have held the gun and shot herself or for someone else to have held the gun and shot her. Dr. Sisler did not find any oil or grease on Viki's hands.

Dr. Sisler testified that, while the issue of lividity is very controversial, it is generally thought to begin anywhere from twenty to thirty minutes to two hours. He also testified that lividity "depends if there's existing blood in the vessels [and] [f]rom my looking at the scene, [Viki] lost a considerable amount of blood, and it may delay the onset of this lividity we're talking about."

On cross-examination, Dr. Sisler testified that the Chief Medical Examiner at the Tarrant County Medical Examiner's Office, Dr. Peerwani, reviewed his report and agreed with his "undetermined" finding. He also testified that the State hired Dr. Edmund Donoghue, a medical examiner from Cook County, Illinois, for a third opinion, that the two doctors spoke, and that Dr. Donoghue told

---

[10]When the prosecutor asked if he had analyzed the defendant's statement, Dr. Sisler responded that "all" he had done was "look at it."

24

him he agreed with the "undetermined" finding. Dr. Sisler further testified that his "undetermined" finding has not changed since 2002, even though additional testing has been done by his office, even though he had been asked to review the case again, and even though he attended a meeting of all the investigative agencies to discuss the case. On re-redirect Dr. Sisler testified that he would not change his findings based on law enforcement's conclusions or discussions about a defendant's statement. On re-cross, he answered affirmatively that, if evidence were presented to him that changed his mind, he would amend his report.

### *Monica Popov, M.D.*

Monica Popov, an obstetrician and gynecologist, cared for Viki during her pregnancy. Much of Viki's pregnancy was routine. Because Viki had indicated in her medical history that she had bled a lot in prior medical procedures, Dr. Popov referred her to a hematologist to check for a bleeding disorder, but the tests were all negative. During her delivery, Viki experienced a second-degree tear, a fairly common occurrence for a first-time mother. The tear had healed by Viki's six-week postpartum visit. Dr. Popov never ordered Viki to be on bed rest, and there were no indications that Viki could not take care of her baby or that she was non-functioning. Dr. Popov testified that Appellant's statements regarding Viki's pregnancy were untrue, including that there was a possibility that she would not survive childbirth. On cross-examination, Dr. Popov acknowledged that she did not know what Viki may have told Appellant.

25

## E. Forensic Evidence

### Ronald Singer

Ronald Singer, crime lab director for the Tarrant County Medical Examiner's Office, examined the Glock handgun, which he determined worked properly. He testified that the Glock could not fire upon being bumped, hit, dropped, or banged; instead, "in order to fire it, you must have your finger on the trigger and you must pull the trigger to the rear. . . . [The internal safety is] disconnected as the slide goes back. You have to release the trigger and then pull it [back] again" to fire the weapon.

### Patricia Eddings

A senior trace analyst for the Tarrant County Medical Examiner's Crime Lab, Patricia Eddings, conducted a trace examination on Viki. Eddings found a single partial grain of what she believed to be a piece of popcorn on one of Viki's front teeth. A forensic botanist confirmed it was popcorn. Eddings noted that, even after a person dies, enzymes continue the digestion process. Eddings also found small, particulate pieces of grain on the front of Viki's chest and also on her side toward her back that the botanist confirmed were popcorn. Eddings recovered remnants of popcorn from the contents of Viki's stomach that were collected during the autopsy. Eddings recovered small grains (identified as popcorn) and salt grains from the blanket, sheet, and comforter.

Eddings examined the gun, which she noted had a considerable amount of oil on it. She was unable to find any useable prints on the gun, the magazine (or

26

its cartridges), or the spent casing, due in part to the excessive oil. She also testified that no gunshot particles were found on the clothes taken from Appellant at the crime scene.

On cross-examination, Eddings agreed that there was no way to determine how long the popcorn articles had been in the bedding. When asked if the popcorn could have been there for months, Eddings stated, "depending on when they washed the blankets and sheets last, yes, sir." When asked if she could determine how long the popcorn had been in Viki's stomach, Eddings responded "[n]ot definitely," but explained that stomachs empty after several hours and that, while this is "quite variable . . . . [w]e think an average of four to six hours." The piece of popcorn in Viki's mouth measured one millimeter by one and one half millimeters. She testified that the photograph of the popcorn shown to the jury was magnified many, many times. She agreed that the popcorn was a "very small grain" but that it was visible to the naked eye.

## F. Background Contextual Evidence

### *Viki's Friends and Coworkers*

Vicki Sargent, an educator and Viki's friend, testified that Viki had been a committed and passionate teacher for many years. When Sargent went to visit Appellant and Viki's mother, Anna Farish, Farish specifically mentioned that

Monty, Appellant, and Viki had gone to the park the day of the shooting and that, after eating popcorn, they had gone to Target.[11]

Sargent, as well as fellow teachers Teresa Starrett and Janet White, testified that although Viki had returned to work after her maternity leave, she had been approved and was very excited to take leave the next school year to stay home with Monty. White also testified that Viki planned to teach piano during her leave the following year. Viki's hair stylist, Cheryl Escobedo, testified that Viki had a hair appointment scheduled for late July, several weeks after the shooting.

### Karen Alexander

Karen Alexander testified that she dated Appellant from mid-1998 until March 2001. While Alexander knew Appellant was married, he told her that he did not love his wife, that he was not happy, and that at a "certain time" he would leave her. He told Alexander that he and his wife were inheriting money from a trust his wife's father had established and that he needed to stay with her until then. He also mentioned having a million-dollar life insurance policy on his wife. "Money was important to him," she said. In 2000, Appellant told Alexander that his wife had terminal leukemia and had only six months to live. Appellant cried about his wife's alleged condition and talked about assisting her in ending life.

---

[11]Farish testified she knew that Appellant, Viki, and Monty went to Target the day of the shooting, but she did not remember if Appellant told her that. She also testified that Appellant did not tell her that he, Viki, and Monty had eaten popcorn that day.

He explained that he wanted to end his wife's pain and had considered poisoning her. Appellant told Alexander that when Viki died of leukemia, he would have money from her family plus the million dollars from the insurance policy. Appellant gave Alexander a promise ring, and they talked about getting married.

*Detective Cynthia (Cindy) Waters*

Cindy Waters began working in the Denton Police Department in 1994, and by 2001, she had become a detective. In February 2001, she and Appellant began dating, although they were both married at the time; Waters had two children, and Appellant and his wife were expecting a baby.[12] Appellant told Waters that he did not have much of a sexual relationship with his wife, and he described their relationship as a friendship but added that they did not get along that well. Waters believed that both Appellant and his wife wanted the divorce. Appellant told Waters that he and Viki had talked about splitting up one year after the baby's first birthday, which was in August 2002.

Throughout their relationship, Appellant and Waters wrote love letters to one another, several of which were read to the jury and introduced as evidence. Appellant often wrote about the family he and Waters would have. In December 2001, Appellant gave Waters a ring, describing it as "a temporary replacement

---

[12]Waters testified that she and her husband had discussed divorce and were moving in that direction when she began dating Appellant. She also testified that Appellant pursued her and that she reluctantly let the relationship expand beyond a friendship.

for the one forthcoming."   In February 2002, Appellant sent Waters a card that stated, "Happy Anniversary to My Wife."

In February 2002, unbeknownst to Waters at the time, Appellant took out a $350,000 life insurance policy on Viki (in addition to the $750,000 policy that he took out on her life in 1999).  This same month, Appellant and Waters began looking for houses in the $300,000– to $500,000 range where they could live as a family.  Although they could not afford a house in this range on their police salaries, Appellant told Waters that he had approximately $700,000 in Mexico that would not be involved in the divorce.  Waters understood that Viki's family had a lot of money, that her father had left her a trust fund, and that Viki would receive a large sum of money when she turned thirty-six.  Waters acknowledged she was warned by colleagues that Appellant would never leave Viki because of the money.

In March or April 2002, Appellant told Waters that he and Viki had agreed to separate earlier than expected and that he would be moving out in June.  He said that he and Viki would file for divorce in April and that it would be finalized in July.  Appellant told Waters that he had rented an apartment to move into after the divorce.  At one point, Appellant told Waters that the divorce papers had been filed but that Viki's mother had paid to have the records sealed.  Waters testified that she had since been told that Appellant had never filed for divorce, and she read a certified statement from the clerk of the Denton County district courts stating such.

In mid-June, Waters discovered that Appellant had lied to her about a trip he took, telling her he was going to visit a relative when he actually went on a trip with his wife, son, and mother-in-law. Although Waters intended to end the relationship, Appellant asked for another chance. Appellant told Waters that if he had not moved out of his house by June 30th, he would understand if she did not want to continue their relationship. On June 30, Appellant met Waters in a parking lot and told her that he could not move out, that he and Viki had been in a fight, that he had slapped Viki, and that he did not know if she would press charges. He returned all the cards Waters had given him. He told her Viki was unstable and that he thought she had been giving Monty milk even though he was allergic to it. He also thought Viki was poisoning him [Appellant]. Waters told Appellant they needed to end their relationship. She became afraid for herself and Viki. Nonetheless, Appellant and Waters remained in contact, and in the early morning hours of July 6, Appellant went to Waters's house. Appellant insisted that he would get a divorce and that he and Waters could rebuild their relationship, but Waters believed the relationship was over.

Waters testified that the day of the offense, she and her two sons went to Lake Ray Roberts with her friend Jackie Coursey and Coursey's daughter. The boys' father picked them up between 5:00 and 6:00 p.m. at Waters's home. Afterward, Waters took a nap and then went to Coursey's house to borrow some jeans. Waters left Coursey's house around 8:00 p.m., and Rhonda and Randy Eakman picked up Waters at her home around 8:30 or 8:45 to go dancing.

31

Waters and the Eakmans went to a club. Waters identified her signature on an application for temporary club membership that she signed at 9:14 p.m. She also identified the Eakmans' signatures on the application that they signed at 9:15 p.m. Waters further testified that she and the Eakmans had one drink and left the bar. Around that time, Coursey called Waters and the two met at Waters's home. Coursey told Waters that Viki had died.

On Monday, July 8, 2002, Waters met with her supervisors. Over the course of the next week, Waters gave several statements in which she confirmed her affair with Appellant and told them Appellant was getting divorced. She eventually resigned. In the middle of the week, Waters told Appellant that she had told her supervisors about the divorce. The two met several days later, and Appellant told Waters that he had come from tanning and that he had found Viki on the bed and that she had been shot. He told her that he moved Viki to the floor and started CPR and that, other than that, it was better if she did not know details.

On cross-examination, Waters acknowledged that she and Appellant resumed their relationship sometime after Viki's death. Waters denied that Appellant "left her," and she did not know whether Appellant subsequently married one of Monty's teachers.

## G. Defense Witnesses

### *Lawrence Renner*

Lawrence Renner, a certified senior crime-scene analyst, reviewed the evidence in this case. He agreed that the manner of death was undetermined. He testified that a person who is shot in the heart with a gun could still move, at a minimum, for ten to fifteen seconds, depending on the organs that are injured. Defense counsel asked, "if Ms. Lozano did not die instantly, what effect could that have on blood being on that [Break-Free] can?" Renner answered, "If she did not die instantly, then there would be the possibility for movement."

When asked, "if a person put socks on their hand and was cleaning the gun, would you necessarily expect to find oil on their hands," Renner responded, "it would depend on how oily the socks had become. They may protect the hands from any oil." He also agreed that oil placed on a person's hand could dry and be invisible to the naked eye. Renner disagreed with the State's theory that the newspaper had to have been placed on the bed postmortem, explaining that there was no way to determine whether the blood was there first and the newspaper put down or whether the newspaper was there first and the blood ran over into it.

Renner testified that the crime-scene photographs were taken two hours after Viki's body was discovered and that the stains shown in the photographs might not be the same as when the body was discovered, thereby making reconstruction difficult. Renner testified that the bloodstain on Viki's left pajama

33

sleeve and the blood on the comforter could not have occurred while Viki was in the position in which she was found and that Appellant's statement about how he found the body could explain the stains.

When asked to outline the movement that could have caused the shell casing to change locations from the point of firing to the location where it was ultimately photographed, Renner testified that the autopsy report establishes that Viki was lying down on her left side at one point; Appellant reported finding her in a more upright position; Appellant reported moving her onto her back; items were moved when looking for the casing; dogs got on the bed; and the body was removed from the bed.[13]

Renner agreed with defense counsel that there was no way, without having been present, to reconstruct the shooting exactly the way it happened. Renner testified that the evidence in this case is insufficient to classify Viki's death as a homicide or to suggest that Appellant was in the room or had the gun in his hand, at the time it was fired.

On cross-examination, Renner acknowledged that, if Viki died while Appellant was gone, the evidence showed that she would have cleaned the gun (leaving it oily), deliberately loaded it, deliberately charged it, and then laid down holding it. Renner acknowledged that in a suicide to the chest, the "most likely"

---

[13]Renner examined much of the bedding from the crime scene in front of the jury and testified to seeing what appeared to be animal and human hairs on the sheet, comforter, blanket, and pillows.

or natural gun position would be straight-on. A "less likely" gun position would be the one established in this case (indicated by the downward wound track). Renner agreed that the established position of the gun in this case would be a "natural" position for someone else to have been holding the gun when Viki was shot. On re-direct, Renner agreed that there was no way to create one particular scenario regarding what happened in this case.

*Anna Farish*

Viki's mother, Anna Farish, testified that Viki was "very, very mechanical," that Viki had a gun at one point, and that she had gone to the firing range with Appellant. Farish testified that she lived with Appellant and her daughter but that she had been gone from the home the day of the shooting. She testified that there had been other times, however, when she had gone back to their bedroom when Appellant was not home and had seen the gun laying on the right side of the bed on newspaper with socks and a cleaning kit. She testified that she had never seen Viki clean the gun, explaining that she would leave the room because she was not comfortable with guns.

Farish testified that Viki suffered from depression due to issues with her weight and that their family had a history of suicide. Farish testified that Viki and Appellant were extremely happy to have Monty and experienced their greatest love for each other after his birth. She testified that Appellant and Viki had identical amounts of life insurance on the other and that they took out the additional insurance due to their child's birth. Farish told Appellant, the police,

35

and others that the dogs must have gotten on the bed and caused the gun to go off accidentally. She testified that Viki knew Appellant was having an affair because Viki had seen several phone calls to the same number on a phone bill.

When asked on cross-examination whether she thought Appellant treated her daughter well, Farish responded, "She was very happy. He saved her life." She explained that Viki had been "a pretty lonely, miserable girl" until Appellant came into her life. Farish testified that she still lived in the LaMancha house with Appellant and his new wife.

### III. Sufficiency of the Evidence

In his first and second issues, Appellant asserts that the evidence is legally and factually insufficient to support his conviction. Because the court of criminal appeals recently eliminated the factual sufficiency standard of review from this state's criminal jurisprudence, *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010), we overrule Appellant's second issue and consider only the first in determining whether the evidence is sufficient to support the jury's verdict.

### A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *see Adames v. State*, No. PD-1126-10, 2011 WL 4577870, at *3–4 (Tex. Crim. App. Oct. 5, 2011). Each fact

need not point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts are sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing an actor's guilt and can be sufficient to establish guilt. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *Clayton*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

We defer to the jury's determinations of credibility and may not substitute our judgment for that of the factfinder. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper*, 214 S.W.3d at 16–17. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Clayton*, 235 S.W.3d at 778.

## B. Applicable Law

A person is guilty of murder if he (1) intentionally or knowingly causes the death of another or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. *See* Tex. Penal Code Ann. § 19.02(b)(1), (2) (West 2011). A person acts intentionally with

respect to a result of his conduct when it is his conscious objective or desire to cause the result.  *See id*. § 6.03(a) (West 2011).  A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.  *See id.* § 6.03(b).  The trial court's guilt/innocence charge instructed the jury to find Appellant guilty of murder if it found he either (1) intentionally or knowingly caused Virginia Lozano's death by shooting her with a firearm, or (2) intended to cause her serious bodily injury and committed an act clearly dangerous to human life by causing a firearm to discharge at or in her direction.

## C.  Analysis

Appellant asserts that no physical evidence or eyewitnesses prove his guilt and that the State's theory—that he shot his wife and then staged the scene to make it appear to be an accident or suicide—has no evidentiary support and is nothing more than conjecture and speculation.

Appellant attempts to isolate and discount certain aspects of the State's evidence; however, the court of criminal appeals has emphasized that intermediate courts must not rely on "the divide-and-conquer" approach and instead must consider the combined and cumulative force of the evidence.  *See Clayton*, 235 S.W.3d at 778.  We may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder.  *Williams*, 235 S.W.3d at 750. Based on the analysis set out below, we disagree with

38

Appellant's assertion that the State did nothing more than raise various questions, the end result of which is an exculpatory explanation.

Appellant challenges the State's theory that the lividity seen in Viki's body by the first responders indicated that she had to have been dead before Appellant left for the tanning salon. Appellant relies on Dr. Sisler's testimony that lividity can begin as quickly as twenty minutes from the time of death. He also relies on his own calculation (with no citation to the record) that the trip to the tanning salon took "a minimum of forty minutes and more likely fifty to sixty minutes" and that it took another five to ten minutes before the paramedics arrived. Appellant contends that the timeline shows that he was away from home for a sufficient period of time for Viki to be fatally shot and for lividity to set in prior to the paramedics arriving, even if lividity begins at thirty or more minutes.

Appellant's written statement provides that he left the house when "it was nearing 8:30 p.m" and that he returned home at approximately 9:00 p.m. The evidence established that the salon was ten minutes away, that Appellant had an 8:26 tanning session that lasted twenty minutes, and that Appellant spoke to the attendant. The 911 dispatcher called responders at 9:05 p.m. Throughout trial, the State assumed that Appellant was away from home for forty to forty-five minutes. As the State points out, there is no evidentiary support for Appellant's suggestion on appeal that he was "more likely" gone fifty to sixty minutes and that the paramedics did not arrive for ten minutes after that.

39

Further, the State's evidence regarding the timing of Viki's death was not based solely on lividity. Captain Scholl testified that the body was clammy, "very cold to the touch and very waxy, which is kind of an indication that she had been dead for quite some time." He testified that her temperature and appearance matched the lividity and made him believe she had been dead for at least an hour if not longer. While he agreed on cross-examination that lividity can set in as early as twenty minutes after death, he added that, based on his experience, "that body had been there a lot longer than an hour." Paramedic Galbraith testified that Viki was cold to the touch, her skin looked pale white, and she had lividity in her right foot. Considering these three components, Galbraith determined that Viki had been dead longer than an hour. Moreover, as Chief Deputy Howell explained, the level of lividity in Viki's body indicated that Appellant's time frame for his trip to the salon "should have been a little bit longer" because there had to be enough time for her to begin cleaning the gun and shoot herself and then additional time for lividity to set in. Ranger Murphree testified that it would take fifteen to twenty minutes to clean a gun "decently" and that it would take as much as thirty minutes to "really get it clean."[14] Dr. Sisler testified that Viki's considerable blood loss may have delayed the onset of lividity. Thus, there is evidence to support the State's theory that the lividity in Viki's body indicated that she was dead before Appellant left for the tanning salon.

---

[14]He acknowledged on cross-examination that a person could "quick clean" a gun in a few minutes.

Appellant also challenges the State's evidence and theory that the crime scene was staged.[15] He initially addresses testimony from State's witnesses that it was illogical for Viki and Appellant to clean a gun on a bed, characterizing this as "nothing more than an opinion expressed by State's witnesses." He argues that it is a reasonable inference from the evidence that cleaning the gun on the bed was a regular activity for both Appellant and Viki. The jury reasonably inferred otherwise. Although Viki's mother testified that she had seen gun-cleaning supplies on the couple's bed, the jury could have negatively assessed her credibility, believed she was an interested witness who supported Appellant, and disbelieved her testimony.

Likewise, the jury was free to believe the testimony from multiple witnesses that Appellant was obsessed with neatness and cleanliness. Apart from Appellant's neatness, Captain Wawro testified that it was "pretty uncommon for most of us" to clean a gun in the house, not to mention on a bed. Ranger Murphree testified that cleaning a gun is extremely messy and smelly and that it was "absurd" that anyone would consider cleaning a gun in the middle of the bed. Chief Deputy Howell testified that "there were several things that just didn't look

---

[15]We note that Chief Deputy Howell testified that the crime scene appeared staged from the moment he arrived. Thus, although we address Appellant's several challenges to individual pieces of evidence that the State introduced to support the chief deputy's opinion, we consider the combined and cumulative force of the evidence.

41

as if somebody had cleaned a gun there, actually cleaned it. It looked to me like someone had come in afterwards and put those items in place."

Additionally, while Viki's mother testified that Viki was "mechanical and tinkered with things," Ranger Murphree testified that someone who was experienced in gun cleaning would not have put such an excessive amount of oil on the gun. Appellant challenges this testimony, however, asserting that it shows "nothing more than that [she] used excessive oil when cleaning the gun" and that Viki was "more likely to do this than [Appellant] himself, who was an experienced police officer." Notably, Chief Deputy Howell testified that it appeared that someone "had just taken the spray can and held the gun and just sprayed it down, you know, all over, which would be an odd way for me to do it, and I don't know of any other people that clean guns that way." Trace analyst Patricia Eddings testified she was unable to find any useable prints on the gun due in part to the excessive oil. Additionally, Captain Wawro, Chief Deputy Howell, and Ranger Murphree testified that, despite the excessive oil on the gun, no oil was seen on Viki's hands. Dr. Sisler did not find any oil or grease on Viki's hands. Although Appellant's crime-scene analyst Lawrence Renner testified that socks "may protect" a person's hands from oil when cleaning a gun, Chief Deputy Howell testified that the pair of dirty socks on the bed did not appear to have any oil or gun reside on them, did not look like they had been used for anything in the cleaning process, and looked like they were just kind of thrown out there or

42

dropped onto the cleaning box.[16]  He also testified that he did not see any gloves in the bedroom and that, if Viki had accidentally shot herself while wearing gloves, the gloves still would have been on her hands.  Witnesses testified that popcorn found on Viki's person and in the bedding indicated she was eating popcorn around the time of the shooting and that it would be unrealistic to think someone would be eating popcorn and cleaning a gun at the same time.

Appellant also challenges the State's theory that Appellant placed the cleaning kit on the bed (on top of the shell casing) after the shooting.  Appellant asserts that a "fair review of the totality of this evidence shows that the shell casing was found above the gun cleaning kit."  Detective Wawro explained that, although his computer aided drawing showed the casing above the kit, the drawing was incomplete and inaccurate.  He and Detective Grellhesl testified that investigators found the casing in a bedspread wrinkle after removing all the other gun-cleaning-related objects off the bed and that crime-scene photographs were later used to recreate the casing's location to be under the kit.[17]  Ranger Murphree explained that the photographs provided reference points such as the headboard and patterns on the blanket.  He noted that the patterns on the

---

[16]Eddings agreed with defense counsel that the black and gray staining on the socks would "certainly seem consistent with grease or oil" and that, if somebody put socks around their hands before they cleaned a gun, that would cause the black or gray staining on the socks.

[17]Ranger Murphree testified that investigators did not immediately realize that the casing had been under the box.

blanket were unique, that no two were exactly the same, and that one could look at the patterns (as depicted in the photographs) and "fairly accurately place . . . I think within a couple of inches or so where that shell casing was." A photograph of the cleaning kit's location on the blanket before the kit was moved demonstrates that the kit was on top of the casing. Appellant asserts that, despite this testimony, the casing could have moved when Viki's body was examined, when the dogs jumped on the bed, or when the investigators were moving the bed coverings to look for the casing. Ranger Murphree testified, however, that he did not believe it would have been possible for the casing to have moved under the kit while investigators were examining the blanket because the kit was big and heavy, and the investigators meticulously moved things. Further, Officer Fleming testified that the lapdog on the bed stayed near Viki's left knee, that it did not go to Viki's shoulder area where the kit was located, and that it did not appear to walk on the newspaper or to tug, drag, or move anything around.

Appellant challenges the State's "assumption" that Viki's body and the surrounding scene remained exactly the same throughout the police and paramedic response. He relies on the fact that Officer Flemings's and EMT Hankins's reports stated that both of Viki's feet were hanging off the bed, while others reported seeing only one foot hanging off the bed. He also relies on language in a report that paramedics either lifted or rolled her body to look for an exit wound and lividity. Appellant asserts that, since the assumption that Viki's

44

body remained the same was shown to be erroneous, the State's theory that he staged the scene was shown to be wrong. Additional evidence on this issue was introduced, however. Ranger Murphree testified that Hankins never got closer than eight feet to Viki's body and that, from his likely position, the body's appearance would have suggested that two feet were hanging off the bed. Hankins also incorrectly described Viki as wearing a long, white nightgown, when she was actually wearing a pajama top and bottom. Officer Fleming testified that her report was incorrect and that she had "[n]o doubt at all" that only one foot was hanging off the bed. Paramedic Galbraith testified that he lifted Viki's right shoulder and that "there was no movement of the body." Captain Scholl testified that, when Viki's shoulder was rolled, her head may have moved, but that "[t]hat would be the only part of that body that may not have been exactly the way it was when we walked in the door."

Appellant asserts that the medical examiner's testimony that the manner of death was "undetermined" is of "critical importance" because the State had the burden to prove that this was a homicide. Dr. Sisler testified, however, that his conclusion was based on what he saw on the autopsy table; he did not consider the circumstances surrounding the shooting. He testified that, based on the muzzle-to-target distance of three to six inches, it was anatomically possible for Viki to have shot herself or for someone else to have shot her. Appellant's own crime scene analyst, Lawrence Renner, agreed with Dr. Sisler's "undetermined" finding. Further, the State introduced substantial evidence demonstrating that

45

Appellant shot and killed his wife. While Appellant challenged that evidence, we must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793. *Cf. Payne v. State*, No. 12-10-00027-CR, 2011 WL 1662856, at *1–6 (Tex. App.—Tyler Apr. 29, 2011, pet. granted), (mem. op., not designated for publication), PD-1214-11 (Tex. Crim. App. Nov. 9, 2011) (review granted in part on whether court of appeals erred in holding evidence sufficient to sustain conviction where experienced crime scene expert found deceased committed suicide), *available at* http://www.cca.courts.state.tx.us/issues/ISSUES.pdf.

Appellant challenges the State's theory that Viki's position at the time of the shooting was not conducive to cleaning a gun and asserts that Viki may have been in a different position while doing so. Appellant contends that "[i]t is likely that Vi[]ki had, in fact, cleaned the gun and was accidentally shot afterwards." The State introduced several pieces of evidence indicating that Viki did not clean the gun. That Viki was lying on her left side when shot was not a contested issue at trial; it was also uncontested that the muzzle-to-target distance was three to six inches. Witnesses testified that, for Appellant's version to be true, Viki had to have laid on her side holding a deliberately loaded gun out three to six inches while pointing it toward herself. While Appellant contends that the notoriously dangerous Glock was known "to go off accidentally and cause just this type of tragedy," forensics expert Ronald Singer testified that the Glock was designed "so that in order to fire it, you must have your finger on the trigger and you must

46

pull the trigger to the rear." The prosecutor also elicited the following testimony from Singer,

> Q. [State]: Now, if the trigger was pulled and still depressed in the way that I'm doing it now and the slide went back then came forward, does that fire the weapon?
>
> A. No.
>
> Q. What do you have to do to fire the weapon?
>
> A. It's disconnected as the slide goes back. You have to release the trigger and then pull it again.

Appellant also asserts that the failure of the police to perform various investigative tests such as hand wipings was inexcusable and should be considered in this review. While investigators admitted that they failed to swab and test Appellant's hands for gunshot residue, Chief Deputy Howell testified that he had heard reports that Appellant had already washed his hands that evening, which would have washed away any trace of gunshot residue. While additional investigation and testing at the scene might have produced additional probative evidence, the standard of review remains the same, that is, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.

Appellant also asserts that, while his affair was improper, neither this nor the fact that Viki and Appellant took out additional life insurance policies adds evidence to this sufficiency analysis. As set out below, however, these facts are

47

probative of motive, and "[m]otive is a significant circumstance indicating guilt." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (noting that appellant had motive to murder his wife because he was involved in a long-standing affair, his mistress gave him an ultimatum, and appellant did not want to divorce his wife); *see Clayton*, 235 S.W.3d at 781.

We agree with the State that Appellant had the motive and opportunity, that his inconsistent statements and implausible explanations indicate guilt, and that additional evidence supports the jury's finding of guilt. In addition to the evidence set out above, Appellant's actions and words indicate that he wanted access to his wife's money without being married to her. His continued pursuit of Waters after she tried to end the relationship and his dramatic pronouncement to Waters that he could not move out of the LaMancha house indicates he felt pressured by his two worlds. These facts demonstrate a motive for murdering his wife. The evidence also establishes that Appellant had the opportunity to kill Viki.

Intent may also be inferred from circumstantial evidence such as acts, words, and the appellant's conduct. *Guevara*, 152 S.W.3d at 50. Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations are also probative of wrongful conduct and are circumstances of guilt. *Guevara*, 235 S.W.3d at 50; *see Gear v. State*, 340 S.W.3d 743, 747 (Tex. Crim. App. 2011) (recognizing that fact finder can consider a defendant's untruthful statement as affirmative evidence of guilt); *Padilla v. State*, 326 S.W.3d

48

195, 201 (Tex. Crim. App. 2010) (holding that rational fact finder can consider a defendant's untruthful statements as affirmative evidence of the defendant's guilt); *Couchman v. State*, 3 S.W.3d 155, 163–64 (Tex. App.—Fort Worth 1999, pet. ref'd) (reasoning that a jury can infer that a defendant demonstrated "consciousness of guilt" by lying about events surrounding the alleged crime).

The evidence in this case highlights Appellant's many untruthful statements, his inconsistent statements and actions, and the improbability of his explanations. For instance, Appellant told the 911 operator that he knew how to perform and was administering CPR to his wife; however, he did not place Viki on the firm floor (which he would have known from officer CPR training), and multiple responders testified that there was no indication that Appellant had performed CPR. Also, Appellant said that he began CPR procedures from Viki's side of the bed but that he failed to do it properly because he was overcome with emotion; however, he told Waters he moved Viki to the floor and started CPR.

Appellant admittedly omitted from his first statement that he had a mistress and that he spent the night with her the night before the shooting; he provided this information only after Waters told him she had told the police "everything." Additionally, Appellant claimed he played a computer game from approximately 7:00 to 8:00 p.m. the night of the shooting; however, forensic computer expert James Willingham testified that Appellant's computer had not been used for any purpose between 6:00 and 9:00 that evening, and Appellant did not challenge this testimony. Further, it was inconsistent for Appellant to have gone tanning

49

the night of the shooting because he had just gone the night before, on July 5, and the tanning salon records indicated that he typically tanned once a week at most; the salon records showed that in the summer of 2002, he tanned on May 13, 20, 28; June 8; and July 5 and 6.

Appellant inexplicably told investigators in his written statement that following Monty's birth, Viki's doctor ordered her to remain bedridden for two months, that he (Appellant) had been Monty's primary caregiver, and that Viki "remained positive yet somewhat depressed that she was unable to care for her son." Dr. Popov testified, however, that she never ordered bed rest for Viki and that she saw no indications that Viki was non-functioning or could not take care of her baby. Appellant also told Waters that Viki was unable to care for Monty and that Viki wanted—and that he and Viki had filed for—a divorce. At trial, however, the district clerk's certified statement showed that Appellant and Viki had not filed for divorce.

Based on all of the evidence, the jury could have reasonably inferred—as opposed to speculated—that Viki did not clean the gun, or even attempt to do so; that Appellant never attempted CPR on Viki because he shot her and wanted her dead; that he went to the tanning salon to establish an alibi; and that he staged the crime scene. *See Hooper*, 214 S.W.3d at 16 (holding that an inference is a conclusion reached by considering other facts and deducing a logical consequence from them, and speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented). Viewing the evidence in

50

the light most favorable to the verdict, a rational jury could have found the essential elements of the offense beyond a reasonable doubt. We overrule Appellant's first issue.

## IV. Exclusion of Evidence

In his third and fourth issues, Appellant asserts that the trial court erred by excluding from evidence (1) a certified copy of the State's 2004 motion dismissing the 2002 indictment against Appellant and (2) testimony from the former district attorney regarding his dismissal of the 2002 indictment against Appellant.

## A. Factual and Procedural Background

A Denton County grand jury indicted Appellant for murder in December 2002. On July 14, 2004, then Criminal District Attorney Bruce Isaacks dismissed the indictment. The motion to dismiss provided in pertinent part:

> As a direct result of [interviews with members of the Tarrant County Medical Examiner's Office,] the State has learned that the Medical Examiner who performed the autopsy, Gary L. Sisler, D.O., now favors suicide as the manner of death as opposed to undetermined as initially stated in the autopsy report. Other members of the Tarrant County Medical Examiner's Office now believe there is no credible evidence of homicide as a manner of death.

> The State has consulted with the Chief Medical Examiner for Cook County, Illinois who was hired to review the evidence in this case. In reviewing the evidence he found evidence that had been overlooked by the Tarrant County Medical Examiner's Office that supports a conclusion that the death was a result of suicide as opposed to homicide. Following the Cook County Medical Examiner's review of the evidence the State requested the Tarrant County Medical Examiner's Office to re-examine this evidence and conduct additional tests. The results of these tests were

51

communicated to the Chief Medical Examiner for Cook County, Illinois. That Medical Examiner has informed the State that it is his conclusion by a preponderance of the evidence that the manner of death of Virginia Lozano was more likely suicide than homicide.

The State of Texas is unable to proceed given the current opinion of these witnesses. The State of Texas has insufficient evidence to present a prima facie case against Robert Lozano at this time and requests that this case be dismissed.

The Denton County grand jury issued a new indictment on September 25, 2008. Prior to the July 2009 trial, the State filed a motion in limine requesting that Appellant ask for a hearing outside the jury's presence before he or any of his witnesses mentioned the prior indictment and dismissal or the contents of and the facts surrounding the dismissal. While cross-examining Ranger Murphree, Appellant requested permission to ask him whether he knew that Cook County Medical Examiner Edmund Donoghue had concluded that the manner of death in this case was more likely a suicide rather than a homicide. The State objected that "that's not what [Donoghue] said. And it's not what he told me, and it's not what he told Dr. Sisler. It's not a finding of suicide the way it's been erroneously portrayed." Appellant's counsel responded, "Mr. Isaacks will testify there was a report when he was the DA. Now they're saying there's not one. I'd like to call Mr. Isaacks in that regard."

Outside the presence of the jury, Isaacks testified that he had been the elected Criminal District Attorney of Denton County from 1991 until 2006 and that Appellant had been indicted during that time. Isaacks testified that he had asked Dr. Donoghue for an opinion regarding the manner of Virginia Lozano's death

and that Dr. Donoghue had sent him a report concluding that the manner of death in this case was most likely suicide. After receiving this report, Isaacks filed the motion to dismiss the indictment.

Following Isaacks's testimony, Appellant asked for a copy of Donoghue's report. When the trial court ordered the State to provide it, the following dialogue occurred:

> PROSECUTOR: I'm willing to testify as an officer of the court. There is no report. There is no report.
>
> THE COURT: Have you — searched the DA's files?
>
> PROSECUTOR: Every single page.
>
> THE COURT: And —
>
> PROSECUTOR: More than once.
>
> THE COURT: Have you contacted Dr. Donoghue?
>
> PROSECUTOR: Personally.
>
> THE COURT: And what was his response when you asked him for a report?
>
> PROSECUTOR: "I didn't do a report."
>
> DEFENSE COUNSEL: I'd like to add to that as well.
>
> THE COURT: Okay.
>
> DEFENSE COUNSEL: I've spoken to Dr. Donoghue as well, and what Dr. Donoghue told me was that was seven — five years ago, I guess, at the time. He said, anything that I would have done would be in Illinois. He is currently employed in the state of Georgia . . . And he said, I can't tell you if I did or didn't.

PROSECUTOR: Judge, also, the prosecutors handling the case at the time, Ms. Bender and Tony Paul, we've also asked them, and they've said there was no report.

After the State rested its case-in-chief, Appellant offered into evidence the 2004 dismissal motion under rule of evidence 803(8)(C). Tex. R. Evid. 803(8)(C). Rule 803(8)(C) provides that "factual findings resulting from an investigation made pursuant to authority granted by law" are permissible as an exception to the hearsay rule "in criminal cases as against the state . . . unless the sources of information or other circumstances indicate lack of trustworthiness." *Id.*

The trial court sustained the State's objections, explaining that the dismissal was "an opinion of the district attorney of — his interpretation of a report that may or may not exist. . . . Second of all, the trustworthiness, there's a big question here." The trial court specifically referenced the fact that Appellant had elicited Dr. Sisler's testimony that he had spoken to Dr. Donoghue and that Dr. Donoghue had agreed with Dr. Sisler's "undetermined" finding. The trial court concluded,

> And so the medical examiner in this case who did his report discussed with Dr. Donoghue this. That gives me a very, very big question as far as the trustworthiness that another report is out there. So I think it's just too highly prejudicial, amongst other reasons that it's not trustworthy.
>
> . . . .
>
> So, I'm going to sustain the objection [to the dismissal motion] and not admit any discussion of Dr. Donoghue's report unless we can get that report here so everybody can look at it.

54

## B. Standard of Review

We review the trial court's decision to admit or exclude evidence, as well as its decision as to whether the probative value of evidence was substantially outweighed by the danger of unfair prejudice, under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Id.*

## C. Motion to Dismiss 2002 Indictment

Appellant asserts that the 2004 dismissal fits squarely within evidence rule 803(8)(C) because (1) the District Attorney's Office in 2004 reached a factual conclusion following an investigation made pursuant to authority granted the office by law and (2) the source of information and circumstances do not indicate a lack of trustworthiness. In support of his argument, Appellant cites *August v. State* for the proposition that factual findings in a police report are admissible under rule 803(8)(C). *See* No. 02-04-00484-CR, 2006 WL 1174213, at *3 (Tex. App.—Fort Worth 2006, pet. ref'd) (mem. op., not designated for publication). He cites *Pondexter v. State* for the proposition that a police officer's observations are admissible. *See* 942 S.W.2d 577, 585 (Tex. Crim. App. 1996). These cases are not dispositive.

As a hearsay exception, rule 803(8)(C) allows a report to be used against the State if it contains "factual findings resulting from an investigation made pursuant to authority granted by law" and "unless the sources of information or

other circumstances do not indicate a lack of trustworthiness."[18]  Tex. R. Evid. 803(8)(C).  Rule 803(8) presumes admissibility, and the party opposing the report's admission must prove the report's untrustworthiness.[19]  *Moss v. Ole So. Real Estate, Inc.*, 933 F.2d 1300, 1305 (5th Cir. 1991); *see Beavers v. Northrop Worldwide Aircraft Servs., Inc.*, 821 S.W.2d 669, 674–75 (Tex. App.—Amarillo 1991, writ denied).

"[I]n determining trustworthiness under Rule 803(8)(C), credibility of the report itself or the testimony in the report are not the focus.  Instead the focus is the report's *reliability*."  *Moss*, 933 F.2d at 1307.  "The Rule 803 trustworthiness requirement, therefore, means that the trial court is to determine primarily whether the report was compiled or prepared in a way that indicates that its conclusions can be relied upon ('reliability')."  *Id.*

Here, the State tendered evidence that raised questions regarding the reliability of the dismissal motion.  For instance, the motion stated that "the Chief Medical Examiner for Cook County, Illinois" (identified by the parties during the 2009 trial as Dr. Donoghue) "informed the State that it is his conclusion by a

---

[18]Under rule 803(8)(C), investigative reports may contain opinions or conclusions, as long as they are based on a factual investigation and they satisfy the trustworthiness provision of rule 803(8).  *Perry v. State*, 957 S.W.2d 894, 898 (Tex. App.—Texarkana 1997, pet. ref'd) (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170, 109 S. Ct. 439, 450 (1988)).

[19]Texas Rule of Evidence 803(8) is almost identical to Federal Rule of Evidence 803(8), and thus, an examination of federal cases is warranted.  *See Cole v. State*, 839 S.W.2d 798, 801–02 (Tex. Crim. App. 1990).

preponderance of the evidence that the manner of death of Virginia Lozano was more likely suicide than homicide." The report could not be produced, however. The lead prosecutor testified as an officer of the court that he was not aware that Dr. Donoghue had prepared a report, that such a report was not found in the State's file after an exhaustive search, and that Dr. Donoghue personally told him that he did not prepare a report.[20] The lead prosecutor also testified that he had spoken to the prosecutors originally assigned to the case and that they had reported to him that there was no report.[21] While Isaacks testified outside the presence of the jury that Dr. Donoghue had sent him a written report concluding that Viki's death was most likely a case of suicide, he acknowledged that he did not have a copy of the report, explaining that he had left it in the case file when he left the office of district attorney. Isaaks did not indicate during his testimony whether he had ever spoken directly with Dr. Donoghue about this issue.

The dismissal motion also stated that Dr. Sisler "now favors suicide as the manner of death as opposed to undetermined as initially stated in the autopsy

---

[20]Although defense counsel recounted to the court that Dr. Donoghue told him that he could not say whether he wrote a report, the State tendered a post-trial, August 6, 2009 affidavit from Dr. Donoghue, which states, "I never prepared a report of my review of the Lozano evidence for the prosecutors."

[21]In addition, one of two prosecutors originally assigned to this case, Tony Paul, testified during a bill of exception that Dr. Donoghue never generated a written report. Paul further testified that he and prosecutor Debra Bender were the main contacts for Dr. Donoghue, that they contacted and met with Dr. Donoghue, and that Dr. Donoghue never expressed an official or personal opinion that Viki died as a result of suicide.

57

report" and that other members of the Tarrant County medical examiner's office "now believe there is no credible evidence of homicide as a manner of death." Dr. Sisler testified, however, that his "undetermined" finding had not changed since 2002 and that he and his supervisor, Dr. Peerwani, still believed that the manner of Viki's death could have been by homicide, suicide, or accident.[22]

The trial court was understandably concerned that Dr. Donoghue's report could not be produced and that the missing or non-existent report formed the basis for the dismissal motion and Isaacks's proposed testimony. Under the unique circumstances of this case and given the conflicting evidence presented to the trial court concerning the existence or nonexistence of a written report and the opinions allegedly contained within it, all of which formed the basis for the 2004 motion to dismiss the indictment, the trial court's determination that the motion was not admissible under rule 803(8)(C) falls within the zone of reasonable disagreement. *See Martinez*, 327 S.W.3d at 736 (stating trial court does not abuse its discretion unless its decision falls outside zone of reasonable disagreement); *see also Rodriguez v. State*, No. 07-09-00145-CR, 2010 WL 4628580, at *3–5 (Tex. App.—Amarillo Nov. 16, 2010, no pet.) (mem. op., not designated for publication) (holding trial court did not abuse its discretion by determining, based on conflicting evidence, that proffered hearsay testimony had

---

[22]Appellant's own expert Lawrence Renner testified that he agreed that the "undetermined" findings of Dr. Sisler, Dr. Peerwani, and Dr. Donoghue were "accurate."

58

not been sufficiently corroborated as trustworthy and was therefore not admissible under rule of evidence 803(24)).  Therefore, the trial court did not abuse its discretion by excluding the motion from evidence.  We overrule Appellant's third issue.

## D.  Former District Attorney's Testimony

Appellant asserts that the trial court also erred by denying the following request:

> Because we have in evidence right now that Donoghue talked to Sisler and that Donoghue told Sisler he thought it was undetermined.
>
> Donoghue has also told Isaacks — and that's what Mr. Isaacks will obviously testify to based on the testimony yesterday — that his opinion was suicide.
>
> So I'd like to call Mr. Isaacks for the limited purpose of establishing that he talked to Dr. Donoghue and Dr. Donoghue told him his opinion was suicide, without referencing the report.

Appellant contends that Isaacks's testimony (set out above) was not hearsay and was offered to impeach the hearsay testimony of Dr. Sisler (that Dr. Donoghue agreed with his "undetermined" finding).  Appellant explains that Isaacks's testimony was presented as an attack on the credibility of Dr. Sisler's testimony and not offered for the truth of the matter asserted.  Appellant relies on rule 806, which provides in relevant part, "When a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported by any evidence which would be admissible for those purposes if declarant had testified as a witness. . . ."  Tex. R. Evid. 806.

59

As the State points out, Appellant's attempt to impeach Dr. Sisler's credibility is not covered under rule 806; when applicable, rule 806 allows the declarant's—in this case Dr. Donoghue's—credibility to be challenged. "The purpose of Rule 806 is 'to establish a standard for attacking the credibility of a hearsay declarant.'" *Craig v. State*, No. 14-00-01282-CR, 2003 WL 21467209, at *1 (Tex. App.—Houston [14th Dist.] June 26, 2003, no pet.) (mem. op., not designated for publication) (quoting *United States v. Graham*, 858 F.2d 986, 990 (5th Cir. 1988)). The intent of rule 806 is "to permit impeachment and rehabilitation by any means that could be used if the declarant were a witness." *Bee v. State,* 974 S.W.2d 184*,* 190 (Tex. App.—San Antonio 1998, no pet.). If the evidence is submitted primarily to prove the truth of the matter asserted, and not wholly for purposes of impeachment, however, the trial court should exclude it. *Sohail v. State*, 264 S.W.3d 251, 261 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). Thus, the question is whether Dr. Donoghue's statement to Isaacks constitutes impeachment evidence or was in actuality offered to prove the truth of the matter asserted. *See Del Carmen Hernandez v. State*, 273 S.W.3d 685, 688–89 (Tex. Crim. App. 2008).

Statements offered for the purpose of showing what was said, and not for the truth of the matter asserted, do not constitute hearsay. *Montes v. State*, 870 S.W.2d 643, 647 (Tex. App.—El Paso 1994, no pet.) (citing *Nixon v. State*, 587 S.W.2d 709, 711 (Tex. Crim. App. 1979)). This is particularly true when the making of the statement is relevant to a matter at issue at trial. *Id.* (citing *Rich v.*

60

*State*, 510 S.W.2d 596, 598 (Tex. Crim. App. 1974)). If the out-of-court statement is relevant only if the trier of fact believes that the statement was both truthful and accurate, then the statement is hearsay. *Cardenas v. State*, 971 S.W.2d 645, 650 (Tex. App.—Dallas 1998, pet. ref'd).

Here, the trial court had previously ruled that neither the 2004 dismissal motion nor testimony regarding Dr. Donoghue's report were admissible, thus, Dr. Donoghue's credibility was not an issue at trial. Indeed, Appellant's purpose in introducing Dr. Donoghue's statements to Isaacks was not to challenge Dr. Donoghue's credibility; as Appellant argues in his harm analysis: Isaacks's testimony "directly refuted the state's position" and "would have undermined the state's argument that the shooting was not suicide." Thus, Isaacks's testimony regarding information he received from Dr. Donoghue that the manner of death was likely suicide was relevant only if the trier of fact believed that Dr. Donoghue's statement was both truthful and accurate. Because Dr. Donoghue's statement was offered to prove the truth of the matter asserted, it was inadmissible, and the trial court did not abuse its discretion by excluding it.

The two cases cited by Appellant do not alter our holding. *See Sohail*, 264 S.W.3d at 261; *In re E.S.*, No. 13-08-00530-CV, 2009 WL 2623352, at *5–6 (Tex. App.—Corpus Christi Aug. 26, 2009, no pet.) (mem. op., not designated for publication). Appellant cites *Sohail* for the proposition that the State cannot present hearsay to convict a defendant and then legitimately object when the defendant offers hearsay to impeach the hearsay offered by the State. As the

61

State notes, however, the prosecutors did not present the challenged testimony; instead, Appellant elicited the testimony on cross-examination through leading questions. Moreover, *Sohail* is distinguishable because Sohail's impeachment evidence—prior inconsistent statements—reflected on the declarant's credibility and was therefore admissible. *See Sohail*, 264 S.W.3d at 261. Appellant cites *In re E.S.* for the proposition that a prior inconsistent statement offered to impeach a witness's credibility is not hearsay. *See* 2009 WL 2623352, at *5–6. While this statement is accurate in a general sense, for the reasons set out above, it is not dispositive of the issues raised in this case. We overrule Appellant's fourth issue.

### V. Jury Instructions

In his fifth issue, Appellant asserts that the guilt/innocence phase jury instructions failed to require a unanimous verdict in contravention of the Texas Constitution and the code of criminal procedure. Specifically, Appellant asserts that the State charged him with two separate criminal acts—murder under penal code sections 19.02(b)(1) (intentionally or knowing causing death) and 19.02(b)(2) (committing an act clearly dangerous to human life with the intent to cause serious bodily injury)—and that the trial court violated the unanimity requirement by allowing the jury to find him guilty without requiring the jury to agree on which offense he committed. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 19.02(b)(2). At the charge conference, the trial court denied

Appellant's request to instruct the jury that it must be unanimous as to how Appellant committed the murder.

The trial court's guilt/innocence charge instructed the jury to find Appellant guilty of murder if it found he either (1) intentionally or knowingly caused Virginia Lozano's death by shooting her with a firearm or (2) intended to cause her serious bodily injury and committed an act clearly dangerous to human life by causing a firearm to discharge at or in her direction. The charge presented the jury with a general verdict form for murder.

Texas law requires a unanimous verdict in all felony cases. Tex. Const. art. V, § 13; Tex. Code Crim. Proc. Ann. art. 36.29(a) (West 2006); *Leza v. State*, 351 S.W.3d 344, 356 (Tex. Crim. App. 2011). "Put simply, the jury must unanimously agree about the occurrence of a single criminal offense, but they need not be unanimous about the specific manner and means of how that offense was committed." *Young v. State*, 341 S.W.3d 417, 422 (Tex. Crim. App. 2011). This court has held that penal code sections 19.02(b)(1) and 19.02(b)(2) do not describe different offenses; rather, they set forth alternative methods of committing the same offense. *See Bundy v. State*, 280 S.W.3d 425, 431–33 (Tex. App.—Fort Worth 2009, pet. ref'd); *see also Young*, 341 S.W.3d at 423–24. The jury unanimity requirement is not violated when, as here, the defendant was indicted under a statute providing alternate means of committing the same offense. *See Davis v. State*, 268 S.W.3d 683, 712 (Tex. App.—Fort Worth 2008,

pet. ref'd); *see also Bundy*, 280 S.W.3d at 433 ("[B]ecause precedent clearly holds that, for the purposes of jury unanimity, the variant means of murder comprise only one offense, there is no violation of the unanimity requirement in this case.").

Our sister courts have similarly resolved this issue. *London v. State*, 325 S.W.3d 197, 207 (Tex. App.—Dallas 2008, pet. ref'd) (rejecting argument that the jury charge alleged two separate statutory offenses of murder, allowing the jury to return a non-unanimous guilty verdict); *Garcia v. State*, 246 S.W.3d 121, 141 (Tex. App.—San Antonio 2007, pet. ref'd); *Yost v. State*, 222 S.W.3d 865, 877 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd); *Barfield v. State*, 202 S.W.3d 912, 916 (Tex. App.—Texarkana 2006, pet. ref'd); *see Villa v. State*, No. 10-09-00385-CR, 2011 WL 1902017, at *4 (Tex. App.—Waco May 18, 2011, pet. ref'd) (mem. op., not designated for publication).

Further, Appellant's reliance on *Ngo* is misplaced. *See Ngo v. State*, 175 S.W.3d 738 (Tex. Crim. App. 2005). The court of criminal appeals recently set out the facts in *Ngo* as follows:

> In a single-count indictment, Ngo was charged with credit card abuse. The three paragraphs under the single count alleged three separate acts of credit card abuse: that Ngo stole a credit card; that Ngo received a stolen credit card; and, that Ngo fraudulently presented a credit card to pay for goods and services. The evidence showed that Ngo committed each of the credit-abuse offenses in a different way on separate occasions. Setting out the three acts in the disjunctive, the charge instructed the jury to convict Ngo of one offense of credit card abuse if they found that he committed any of the three separate offenses.

64

*Cosio v. State*, No. PD-1435-10, 2011 WL 4436487, at *4–5 (Tex. Crim. App. Sept. 14, 2011) (citations omitted). The *Ngo* court held that, because the State alleged different criminal acts, it was error to allow the jury to return a general verdict on whether Ngo committed one of the acts. *Ngo*, 175 S.W.3d at 744–45. *Ngo* is distinguishable from the instant case. *See Davis*, 268 S.W.3d at 712 (distinguishing *Ngo* because "Davis was indicted for a single act: the murder of Latarsha Hampton"); *Barfield*, 202 S.W.3d at 916; *see also Young*, 341 S.W.3d at 424.

The trial court's charge properly required a unanimous verdict, and we overrule Appellant's fifth issue.

### VI.  Hearsay / Confrontation

In his sixth and seventh issues, Appellant contends that the trial court erred by overruling his backdoor hearsay and confrontation clause objections to Ranger Murphree's testimony regarding certain witness interviews.

After Appellant rested his case in chief, the State recalled Ranger Murphree, who testified as follows:

> Q. [State]: And did we take statements during the investigation to confirm Cindy Waters'[s] whereabouts on the evening of July 6, 2002?
>
> A. [Murphree] Yes.
>
> Q. Did we speak and take statements from Rhonda Eakman?
>
> A. Yes.
>
> DEFENSE COUNSEL:  Judge, he's leading the witness —

65

. . . .

COURT: Sustained.

Q. [State]: Can you tell me the three alibi witnesses that we interviewed?

A. Randy Eakman, Rhonda Eakman, and Jackie Coursey.

Q. And without telling me everything they said, what was the –

DEFENSE COUNSEL: I'm going to object to any attempt to describe what they said or implied as hearsay.

THE COURT: Make sure that you don't ask them what was said or was contained in any statements.

STATE: Okay.

Q. [State]: After those interviews, was Cindy Waters ruled out as a suspect?

DEFENSE COUNSEL: Judge, I'm going to object. That's a backdoor attempt at hearsay. That's trying to get into the contents of the statements.

THE COURT: Overruled.

A. [Murphee]: Yes, she was eliminated.

DEFENSE COUNSEL: Judge, at a later time I'd like to make further objections on the record to that testimony.

THE COURT: You may.

. . . .

DEFENSE COUNSEL: The hearsay objection that we made is based on our right to confront and cross-examine the witnesses against us pursuant to the state and federal constitutions, as well as the federal and state due-process-of-law provisions and due-course-of-law protections.

. . . .

STATE: For the record, the, witnesses have been — they are under subpoena.

THE COURT: So you're saying the witnesses are available?

STATE: Yes, Judge, they've all been subpoenaed.

At the time Ranger Murphree testified, Waters had already testified in detail to her activities and whereabouts the day of the shooting. The State also introduced documentary evidence demonstrating that Waters was at a club with the Eakmans at 9:15 on the night of the shooting.

Regarding his backdoor hearsay claim, Appellant complains that Ranger Murphree was "allowed to tell the jury that he interviewed Randy Eakman, Rhonda Eakman and Jackie Coursey and they all confirmed Cindy Waters['s] alibi." Regarding the Confrontation Clause claim, Appellant asserts that "information given to a police investigator, during an investigation of an offense, is classic testimonial evidence." The State contends that Appellant's untimely objections did not preserve error.

To preserve a complaint for our review, Appellant must have timely objected. Tex. R. App. P. 33.1(a)(1); *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009). To be timely, an objection must be made as soon as the basis for the objection becomes apparent. *Aguilar v. State*, 26 S.W.3d 901, 905 (Tex. Crim. App. 2000); *Courson v. State*, 160 S.W.3d 125, 129 (Tex. App.—Fort Worth 2005, no pet.). Additionally, the point of error on appeal must comport

67

with the objection made at trial. *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). The failure to object in a timely manner during trial forfeits complaints about the admissibility of evidence. *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008), *cert. denied*, 555 U.S. 1105 (2009). This is true even though the error may concern a constitutional right of the defendant. *Davis v. State*, 313 S.W.3d 317, 347 (Tex. Crim. App. 2010), *cert. denied*, 132 S. Ct. 122 (2011) (holding that preservation requirements apply to Confrontation Clause complaints); *Robinson v. State*, 310 S.W.3d 574, 577 (Tex. App.—Fort Worth 2010, no pet.)*.*

Here, Appellant failed to preserve error on his specific complaint on appeal: that Ranger Murphree was allowed to tell the jury that the Eakmans and Coursey confirmed Cindy Waters's alibi. Appellant did not object to this opening portion of Ranger Murphree's testimony; instead, Appellant lodged his hearsay and confrontation objections later when the State asked, "And without telling me everything they said, what was the —" and also when the State asked, "After those interviews, was Cindy Waters ruled out as a suspect?" Thus, Appellant forfeited the hearsay and confrontation complaints regarding Ranger Murphree's earlier testimony that the Eakmans and Coursey had confirmed Waters's alibi.

To the extent Appellant's complaint on appeal can be construed more broadly to include the portions of Ranger Murphree's testimony to which Appellant lodged hearsay and Confrontation Clause objections—including the State's question, "After those interviews, was Cindy Waters ruled out as a

suspect?" and Ranger Murphree's response, "Yes, she was eliminated"—the trial court did not abuse its discretion by overruling Appellant's objections because the same or similar evidence had been previously received without objection. *See Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (holding that "overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained of ruling"); *see also Coble v. State*, 330 S.W.3d 253, 282 (Tex. Crim. App. 2010); *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("An error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection."). Ranger Murphree's testimony that he eliminated Waters as a suspect after interviewing Coursey and the Eakmans was essentially cumulative of his prior unchallenged testimony that the Eakmans and Coursey confirmed Waters's alibi. Appellant does not argue that these statements have substantially different meanings.

Because error was not preserved, we overrule issues six and seven.

## VII. Conclusion

Having overruled each of Appellant's seven issues, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, C.J.; GARDNER and MEIER, JJ.

PUBLISH

69

DELIVERED:  January 26, 2012