

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00256-CR

———————————————

JOHNNY RAY ARMSTRONG, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 271st District Court
Wise County, Texas
Trial Court No. CR20548

---

Before Gabriel, Bassel, Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Appellant Johnny Ray Armstrong appeals his conviction and life sentence for the murder of Ruben Dunlap. In four issues, Armstrong argues that (1) he was denied effective assistance of counsel when the trial court chose not to entertain closing arguments at the punishment phase of trial, (2) he was egregiously harmed by the trial court not allowing closing arguments, (3) he received ineffective assistance of counsel when his attorney did not object to the trial court not allowing closing arguments before sentencing, and (4) the evidence is insufficient to support his conviction. We affirm.

### II. BACKGROUND

#### A. 911 Calls Regarding Armstrong

Marissa Martinez, who was working as a 911 dispatcher for the Wise County Sheriff's Office on February 28, 2018, testified that she received a call regarding a possible shooting at Armstrong's residence at roughly 8:24 p.m. Martinez said that because the call related to incidents in the neighboring town of Bridgeport, she dispatched medics to the scene but then transferred the call to a Bridgeport dispatcher. Later, at roughly 11 p.m., Martinez received another call regarding Armstrong's crashed and abandoned vehicle in Wise County. The next night, someone called Martinez's co-dispatcher and said that he had seen Armstrong at a truck stop in Alvord. The caller texted a picture of Armstrong to the co-dispatcher.

Makenna Bates, a dispatcher for the Bridgeport Police Department, testified that she received the transferred dispatch at 8:27 p.m. on February 28, 2018. While Bates was on the stand, the State published the 911 call for the jury. In the audio, the caller can be heard describing that "Ruben Dunlap" had "a puddle of blood" around him, was unresponsive, had a headwound, but was breathing. The caller said that he did not see what had happened, but he heard a loud noise and came out to find Dunlap shot in the head with a gun lying nearby and that he believed Dunlap had shot himself. The caller identified himself as "Johnny Armstrong." [1]

## B. Officers Respond to the Scene of the Shooting

Officer Cody Barlow of the Bridgeport Police Department testified that he was dispatched to 1506 Brush Street on the night Dunlap was shot. Barlow said that he and Officer Nicolas Yates arrived at the scene at roughly the same time. As Barlow entered the living room, he saw Dunlap sitting with his back against a wall and blood appeared to be coming out of his head. Barlow stated that the blood continued to pool while he was there and that Dunlap was "still moving or twitching." While Barlow did not search the house, he observed marijuana in plain sight.

Barlow also found Johnny in the house. According to Barlow, he and Yates both spoke with Johnny that night. While speaking with Johnny, Barlow heard a cough coming from the back of the house. Barlow ordered the person to come into

---

[1]The Appellant in this case is named Johnny Armstrong and so is his son. We refer to Appellant as Armstrong and Appellant's son as Johnny.

the living room and learned that it was a young man named Jackie Armstrong,[2] who is Armstrong's nephew and Johnny's cousin. Barlow placed Jackie in the back of a patrol car to keep him separated from Johnny. Eventually, officers transported Johnny, Jackie, and a woman named Shannon Geninatti Hardy to the police station. Hardy was Armstrong's girlfriend at the time.[3] According to Barlow, he turned his body camera on as he entered the Brush Street residence. The State played footage from Barlow's body camera depicting his entry into the house, some of his encounter with Johnny, and eventually his transportation of Jackie to the police station.

Yates testified that he arrived at the residence shortly before Barlow. He also said that he was familiar with Armstrong, Johnny, and Hardy from previous interactions. After making contact with Johnny and observing Dunlap's condition, Yates found a gun on a nearby love seat. Yates asked Johnny how the gun got there, and Johnny told Yates that he initially found it lying near Dunlap's right leg, but he had picked it up and moved it to the love seat. By Yates's account, Johnny's description of where he found the gun was inconsistent with the gunshot wound he observed on the left side of Dunlap's head. But Yates averred that he did not suspect that Johnny had been involved in the shooting.

---

[2]Both Armstrong and the State spelled Jackie's name as "Jacky" in their briefs, but the trial transcript spells his first name as "Jackie," and we will do the same in this opinion.

[3]Some witnesses testified that Hardy was Armstrong's common-law wife.

Yates also encountered Hardy at the scene and spoke with her. Yates said that he could not understand much of what Hardy was saying because she "was hysterical [and] having trouble forming a coherent sentence." Yates was able to understand that Hardy had said a couple of times that Dunlap was going to give her a ride to Sonic. Hardy was also able to communicate to Yates that there was a gun in the house, but she did not know where it was. Yates later spoke with Hardy a second time, and she told him that Armstrong had shot Dunlap. Based on that statement as well as things he had learned from the other officers who had interviewed other witnesses, a warrant was issued for Armstrong for the offense of aggravated assault with a deadly weapon.

According to Yates, a broadcast was sent out to find Armstrong and his white Expedition, which Yates said was later found crashed off Farm to Market Road 1810 near Chico. Yates said that after Johnny, Jackie, and Hardy finished their interviews, they were released and all three ended up back at the Brush Street residence. By Yates's account, Dunlap's mother arrived on scene after police had arrived.

## C. Armstrong Absconds

Elizabeth Buhay of the intelligence and counterterrorism division of the Texas Department of Public Safety conducted an investigation into the contents of Armstrong's phone. Buhay was able to trace Armstrong's cellphone location, and she discovered that he would have been driving away from the Brush Street residence shortly after the shooting and toward where Armstrong's white Expedition was later

5

found wrecked and abandoned. The Expedition appeared to have crashed through a fence and had barbwire wrapped around some of its tires.

Texas Department of Public Safety Trooper Jose Gomez investigated the crash scene where Armstrong's Expedition was found at 11:02 p.m. on February 28. Gomez said that he learned that Armstrong owned the vehicle and that he lived at 1506 Brush Street. He also heard that Armstrong was the last person seen driving the Expedition. While he was at the crash scene, Gomez learned that other officers were looking for Armstrong, and some of the officers came to the crash scene to investigate.

Daniel Bentley, who knew Armstrong, lived with his parents off Highway 101 between Bridgeport and Chico at the time of the shooting. In the early morning hours of March 1, Armstrong knocked on Bentley's bedroom window. Bentley said he went outside to speak with Armstrong and that Armstrong appeared "all shook up," and he was dressed in jeans, a bright yellow vest, a hard hat, and "rubber" boots. Bentley testified that Armstrong did not normally wear the vest and hard hat, and he could not recall seeing any blood on Armstrong.

Bentley asked Armstrong what was wrong, and Armstrong said that he had wrecked his vehicle. By Bentley's account, Armstrong came to his house in a truck that was not Armstrong's, and the vehicle bore the markings of a rock crushing business. Armstrong told Bentley that he needed a ride, and when Bentley asked Armstrong why he needed a ride given he had driven there in a truck, Armstrong said

6

the truck was "borrowed." Bentley insisted that Armstrong take the truck back to its owner.

Armstrong returned the truck and then met Bentley at a nearby park in Chico. While at the park, Armstrong told Bentley that a "kid" named "Ruben" was playing with a gun and had shot himself at Armstrong's house, and Armstrong did not want to return home. Armstrong asked Bentley to drive him toward Alvord. Bentley said that he did and that he dropped Armstrong off on the side of the road near a truck stop in Alvord. Bentley recalled that for most of the time Armstrong was with him, Armstrong did not say much, but he did tell Bentley that he did not have "a friend in the world but" Bentley.

Later that day, Armstrong called Bentley. Bentley said that he informed Armstrong that Dunlap was still alive, and Armstrong "sounded relieved." Allegedly, Armstrong asked Bentley if Dunlap was "talking," which Bentley interpreted to mean whether Dunlap "was talking so he could tell what happened."

Bentley also recalled that he had gone to the Brush Street residence after lunchtime on February 28 to visit Armstrong and smoke methamphetamine. While he was there, he saw Johnny, Jackie, "and another [male] kid [with] blondish hair." Bentley said that Armstrong had expressed that he did not want the boys in the house.

Mark Nowak, assistant plant manager at Lehigh Hanson, the Bridgeport rock quarry near Farm to Market Road 1810 where Armstrong's crashed Expedition was found, testified at trial. Nowak said that on March 1, 2018, he learned from an

7

employee that some items were missing from a vehicle on site and from the site's mobile shop. According to Nowak, after reviewing surveillance video and learning that items had been taken by an unidentified man, he contacted the police. The State published the surveillance video for the jury, which was captured on March 1, 2018, at 2:59 a.m. The footage showed Armstrong, who was wearing a light yellow vest and rubber boots, walking (and sometimes stumbling) around the shop. At one point, Armstrong carefully opened a door, entered an adjoining room, and then exited the room wearing a hard hat. Armstrong then left the shop. Nowak identified the vest, the boots, and the hard hat as all being Lehigh Hanson property.

Christopher Van Syoc, an employee of Lehigh Hanson, testified that he had seen a man walking away from the shop not long after 3 a.m. on March 1, 2018. Believing he was a Lehigh Hanson employee, Van Syoc offered the man a ride after the man told him his vehicle had gotten stuck. Van Syoc said that he drove Armstrong to an Allsup's in Chico, which is not far from the park where Armstrong met Bentley. Van Syoc said that he grew suspicious after Armstrong threw the hard hat in the back of Van Syoc's truck and after Van Syoc could not locate a stuck vehicle near where he found Armstrong. Van Syoc soon returned to the Allsup's and asked the cashier about Armstrong. The cashier told Van Syoc that the sheriff's department had come to the store looking for somebody involved in an accident near Farm to Market Road 1810. Van Syoc said that he then called the sheriff's office to report what had happened.

Jared Swiney, who was working at the truck stop where Bentley dropped Armstrong off on March 1, testified that law enforcement came to the truck stop and showed him a picture of Armstrong, but he did not recognize him. Shortly after the officers left, Armstrong came out of the bathroom, Swiney then recognized him, and he took a picture of Armstrong with his cellphone. Swiney then called the Wise County Sheriff's Department and reported what he had seen, and he sent the picture he had taken. In the call, Swiney described Armstrong as wearing "purple mud" boots, and he said that Armstrong had left the store.

Jack McGuinn, an investigator with the 271st District Attorney's Office, testified that he had mapped the different locations where Armstrong had been between the shooting and where he was eventually apprehended. By using a visual aide, McGuinn explained to the jury how Armstrong had traveled from his Brush Street residence to the crash site on Farm to Market Road 1810. McGuinn then was able to trace Armstrong's movements from Bentley's residence to the quarry plant, to the Allsup's in Chico, and ultimately to the truck stop in Alvord.

Corporal Lyle Hahn of the Bridgeport Police Department testified that he was dispatched to a location not far from the Alvord truck stop after 7:00 p.m. on March 1, 2018. When he arrived on scene, Hahn spoke with the individual who had called the police. The individual confirmed that he had seen Armstrong earlier, Armstrong had asked to use his phone charger, and Armstrong had then proceeded across the street to an abandoned trailer. Hahn said that by this time, an arrest

9

warrant had already been issued for Armstrong. According to Hahn, he went to the location of the trailer and found coveralls and a first aid kit that had been taken from the quarry shop. Hahn averred that these items could not have already been there prior to Armstrong having been seen there.

Receiving word that Armstrong had been seen at the truck stop in Alvord, Hahn proceeded there. With the help of a helicopter and several other officers, Hahn was able to locate Armstrong in the truck stop's parking lot. As officers approached Armstrong, he walked toward the officers. At that point, Hahn aimed his weapon at Armstrong and ordered him to the ground. Hahn said that Armstrong did not comply; instead, Armstrong told Hahn, "You're gonna have to shoot me." After a few warnings, Hahn pulled out his Taser and tased Armstrong, who fell to the ground and was taken into custody.

Officer Mathew Thomas, formerly of the Bridgeport Police Department, said that he participated in the search for Armstrong and was present when Armstrong was apprehended. While questioning Swiney, the truck-stop employee, Thomas received a broadcast from the helicopter pilot that Armstrong was hiding under the trailer of a nearby 18-wheeler. Similar to Hahn's testimony, Thomas said that as Hahn and other officers approached Armstrong, he heard Armstrong say, "[J]ust shoot me." At that time, Hahn deployed his Taser, and the officers apprehended Armstrong. Because Armstrong told the officers he had ingested methamphetamine, they had Armstrong transported to the hospital.

## D. Cause of Dunlap's Death

Doctor Marc Andrew Krouse, the Deputy Chief Medical Examiner in Fort Worth, conducted and presided over the autopsy of Dunlap's body. Pictures of the autopsy and of Dunlap when he was in the hospital were published to the jury. Krouse's autopsy revealed that Dunlap had died of a single gunshot wound to the left side of his head. According to Krouse, his examination revealed that Dunlap would have been wearing something consistent with a baseball cap at the time he was shot and that he had been shot from an intermediate distance, more than two but less than three feet away. Krouse said that the toxicology report based on Dunlap's blood drawn at the hospital prior to any medical intervention revealed he had THC, Alprazolam, and methamphetamine in his system when he was shot. Krouse said that the examiner's office ruled Dunlap's death a homicide.

## E. Other Witness Testimony

Kendra Smith, Dunlap's former girlfriend, testified that Dunlap had served a few months in jail for driving while intoxicated and possession of drugs. Smith stated that there were rumors that Dunlap had been released early because he had provided information on other people to the police. Smith said that her encounters with Armstrong left her with the impression that he was paranoid and "concerned about the police, and they had cameras and stuff of that sort." Smith also told how a year or more before Dunlap's murder, Hardy's son Devin Geninatti allegedly committed suicide by jumping in front of a car.

11

Chloe Edwards, Armstrong's neighbor, testified that she had come home from school on February 28 and remembered hearing a "loud bang" that she believed to be a gunshot. Edwards said that she got her sister and the two of them went outside. Edwards averred that she saw Hardy crying "[a] lot" and eventually sitting down on a neighbor's porch. According to Edwards, she, her sister, and other neighbors went to check on Hardy, who Edwards described as "skitzing out." Edwards recalled that Hardy "was saying that [Armstrong] did something to [Dunlap], and she wouldn't tell us what he did." Hardy then called Dunlap's mother in Edwards's presence. According to Edwards, she could hear Hardy say to Dunlap's mother, "[Y]ou need to get over here fast. [Armstrong] just shot [Dunlap]."

Another neighbor, Mitchell Comer, testified that on the evening of February 28, he heard yelling and a loud "bang" from outside his window, which Comer agreed sounded like a gunshot. Comer said that his first thought was that "the Armstrongs [were] going at it again." After hearing the noise, Comer said that he saw Armstrong walking out of his house and yelling, but Comer could not make out what Armstrong was yelling. He then saw Armstrong get into the white Expedition and hurriedly drive away. Comer said that ambulances and police vehicles soon arrived. He then saw Hardy walking around talking on her phone. According to Comer, Hardy appeared "very upset," she could not speak in coherent sentences, and she "had tears, snot coming down her face." Comer recalled that Hardy told the person on the other end of the phone that they needed to get over there because Armstrong

12

had done "something bad." "And then she ended up saying, [Armstrong] hurt [Dunlap]."

Comer said that once the police began to speak with Hardy, she told them what had happened in more detail:

> What she said was that – she still was crying and everything too, but she said that she needed a ride to Sonic because [Armstrong] had tore up her truck to where she couldn't drive it and that [Dunlap] was gonna give her a ride and that they started arguing and then [Armstrong] shot him and left.

Comer testified that Johnny had once told him that if Armstrong ever did anything wrong, he would "cover for him" and that he spoke with Johnny later that night and hung up on him because he thought Johnny was lying about having been asleep when Dunlap was shot. Comer said that the Armstrongs did not believe that Hardy's son had killed himself a few years earlier and that they speculated that Dunlap may have been involved in Hardy's son's death. According to Comer, the cops were called to Armstrong's house "almost every night," and he "never knew what was going on" at that house. Comer averred that the gunshot he heard on February 28 was not the first time he had heard gunshots emanating from Armstrong's house: "[T]here's several times I've heard shots." And he recalled an event where Hardy had shot at Armstrong.

Bridgette Walker, Comer's mother and another of Armstrong's neighbors, testified about the events that night, and she remembered Hardy saying, "I can't believe he did it." By Walker's account, Hardy had come to her house a few weeks

13

earlier in only a t-shirt and underwear, and her legs were covered in cuts and bruises. Hardy told Walker that Armstrong had struck her and that she was scared, so Walker called the police. Hardy also told Walker that she believed Armstrong and Johnny were involved in her son's death.

Dylan Craig testified that he, Johnny, Jackie, and Dunlap had all met at Armstrong's house to play video games on February 28, and Dunlap was very relaxed because he was under the influence of Xanax. According to Craig, Armstrong was acting "shady," and Jackie told him that Armstrong thought that Craig and Dunlap were "cops." Craig also said that Armstrong appeared to be "strung out" on methamphetamine. Craig averred that he had known Dunlap for some time and that Dunlap had never indicated that he was suicidal. To the contrary, Craig described Dunlap as "always happy, making jokes, [and] having a good time." Craig said that after learning of Dunlap's being shot, he called Jackie, who told him he could not talk because the police were there. Craig also said that he spoke with Jackie the next day and that Jackie said that after he had heard the gunshot, Armstrong ran into the room Johnny and Jackie were in and stated that he had shot Dunlap. Jackie also allegedly told Craig that Armstrong had taken "the dope" and left. And Jackie told Craig that Dunlap had been trying to give Hardy a ride to Sonic, but Armstrong told him not to, but Dunlap insisted. Jackie told Craig there had been an argument, and Armstrong shot Dunlap.

14

Erica Geninatti, Hardy's daughter, testified that Hardy and Armstrong were common-law married at the time of the shooting. She said that she knew Johnny and Dunlap because she used to live at the Brush Street residence. Geninatti stated that when she lived there, Armstrong and Hardy were constantly accusing each other of infidelity, and Hardy would often leave in the middle of the night to get away from the arguments. According to Geninatti, Armstrong was very jealous and would not let Hardy leave with another man to go anywhere. She described Armstrong as "very intimidating." Geninatti recalled how on one occasion, she stood up to Armstrong, and he spit in her face and told her to leave. By Geninatti's account, Hardy did not believe that her son had committed suicide, and Hardy believed that Johnny and Armstrong were involved in her son's death. Geninatti said that Armstrong owned a .38 revolver, and at one point, Hardy called her and told her that Armstrong had shot Dunlap because Dunlap had offered to drive Hardy to Sonic. Given her familiarity with Armstrong, it did not surprise Geninatti to learn that Armstrong would shoot someone over something so trivial.

Maria Garza, Dunlap's mother, said that on the night of Dunlap's murder, Hardy had told her that Armstrong had shot Dunlap over Hardy's wanting a ride to Sonic. Garza said that she went to the Brush Street residence after learning of Dunlap's shooting, but the police would not let her enter the house. Eventually, Garza made her way to the hospital, but Dunlap was unresponsive and later died.

Jackie testified that Armstrong and Hardy were "bipolar" toward each other in that "one minute they're mad and one minute they're okay." Jackie described how in the week leading up to the shooting, he and Johnny, and sometimes Armstrong, had been on a week-long methamphetamine "binge." According to Jackie, on the day of February 28 and at the request of Armstrong, he and Johnny had disabled Armstrong's truck because Hardy "kept stealing" it. Dunlap showed up later and Jackie, Johnny, and Dunlap were playing video games as well as smoking marijuana and methamphetamine. Dunlap had also taken Xanax. Jackie described Dunlap as "friendly" and as not having "a mean bone in his body." Jackie and the others took a ride for a while, leaving only Armstrong and Hardy in the house, and then returned just as it was getting dark. By Jackie's account, he and Johnny went back to the room to play more games and to sleep. Jackie said that when he and Johnny went to Johnny's room, Hardy, Armstrong, and Dunlap were still outside. Shortly after, Jackie heard a gunshot, so both he and Johnny ran into the living room and found Dunlap on the floor with a gunshot wound and a gun lying next to him. At the same time, he saw Armstrong and Hardy exiting the front door.

Jackie said that he ran to his room to find his cellphone in order to call 911, and when he returned to the living room, Armstrong had come back inside. Armstrong told Jackie to give him any drugs that he may have because he was leaving. Jackie admitted that he falsely told the police when they arrived that he had not seen Armstrong that day because he "was scared" but that shortly before trial he admitted

16

to Armstrong's presence when the shooting occurred. Jackie did not believe that Dunlap was suicidal. According to Jackie, a month after the shooting, Hardy told him that Armstrong had not shot Dunlap. Jackie also said that Armstrong was suspicious of others, and he often accused others of working for the police. He would sometimes ask Jackie to lift up his shirt to show that he was not wearing "a wire." According to Jackie, Armstrong had asked him whether Dunlap was working for the police.

Johnny testified he was living with Hardy and Armstrong the day of the shooting. He also said that Hardy blamed him for her son's death. Like Jackie's testimony, Johnny said that he and Jackie had been "holed up" in his room for several days before Dunlap was shot, smoking methamphetamine and playing video games. Johnny recalled that on February 28, Dunlap had smoked methamphetamine with him and Jackie.

According to Johnny, there had been prior discussions in the Armstrong house about how Dunlap may have been involved in Hardy's son's death. Johnny said that he, Dunlap, and others had gone to sell some marijuana that afternoon and returned just before dark. Johnny and Jackie retreated to Johnny's room to play video games when he heard a loud sound. Johnny testified that he did not recall Armstrong coming into his room; rather, he and Jackie ran to the living room to see what had happened. Johnny said he saw Dunlap lying on the ground with blood "falling out of his head," but he did not recall seeing either Armstrong or Hardy. He also saw a gun

17

on the ground near the left side of Dunlap's body. Johnny said that after Armstrong was arrested, he visited him in jail, and Armstrong said that Dunlap had tossed him the gun and that it accidently fired and shot Dunlap. By Johnny's account, a few weeks after the shooting, Hardy came to Sonic where Johnny was working and told him that she was the one who had shot Dunlap.

Johnny also recalled a time when Hardy had shot at Armstrong and the police were called. Johnny said that two weeks prior to Dunlap's being shot, Hardy once pointed a gun at him and accused him of having killed her son. Johnny stated that the gun Dunlap was shot with was Hardy's gun.

Natalie Vidal testified that she was Armstrong's former wife and Johnny's mother. Vidal said that Johnny told her about the night that Dunlap was shot and described how when Dunlap was speaking with Armstrong, he and Jackie heard a loud noise, they went to the living room, Dunlap was lying on the floor, and Armstrong was not there. Vidal said that a few weeks after Dunlap's death, Hardy told her that Armstrong was not the person who had shot Dunlap and that the person responsible for Dunlap's death was going to confess; Vidal noted, however, that Hardy had previously told her that Armstrong was Dunlap's shooter. Vidal recalled a conversation with Johnny after the shooting where Johnny said, "I can't believe my dad just left me there," referring to Armstrong's leaving on the night of the shooting.

Hardy, who was incarcerated at the time of her testimony for aggravated assault with a deadly weapon and testified pursuant to a bench warrant, said that the .38

18

revolver was Armstrong's gun. According to Hardy, Armstrong had choked her to the point of unconsciousness two weeks prior to Dunlap's death. She said that when she awoke, she was barely clothed and that she tried to leave, but Armstrong would not allow it. Hardy stated that she eventually was able to escape and fled to a neighbor's house.

Hardy described how on February 28, several of Johnny's friends were in and out of the house. Eventually, Dunlap came to the house, and he and others left for a short time. According to Hardy, there "had been talk" between her and Armstrong that Dunlap was an undercover informant for the police and that he had been involved in her son's death. Hardy said that after the boys left, she attempted to drive her truck to Sonic, but the truck would not start. About that time, Dunlap and the others returned, and Dunlap offered to drive Hardy to Sonic. Hardy said that she went inside the house and into her bedroom to get her purse and umbrella and to also lock the bedroom door. By this time, Armstrong and Dunlap were standing in the living room. Hardy then went into the living room, and Armstrong told her to shut the front door, but she did not, so Armstrong shut the door. Hardy said that the next thing she saw was Armstrong "pull out the gun" from his waistband "and shoot" Dunlap. Hardy recalled how Armstrong was "point-blank range" from Dunlap and aimed at his head before pulling the trigger. Hardy said that Dunlap was looking at his phone when Armstrong shot him.

Hardy recalled how she tried to run out the front door, but Armstrong grabbed her. At that moment, according to Hardy, Johnny ran into the living room, so Armstrong released his grip on her and seized him, which enabled Hardy to run out the front door. Hardy said that she made it to the neighbor's front yard before Armstrong caught her and said that she "owed" him. By Hardy's account, Johnny came outside the house at that time, so Armstrong let her go and ran and pushed Johnny back into the house. Hardy eventually ran to a neighbor's house and hid, and then she heard an engine racing, which she believed to be Armstrong leaving. Shortly after, Hardy said that the police arrived. From there, Hardy borrowed a neighbor's phone, called Dunlap's mother, and told her that he had been shot. Hardy said that after talking to the police that evening, she hid at friends' houses until she learned that Armstrong had been arrested.

Hardy said that she visited Armstrong in jail and that he told her that the people involved in her son's death were "dropping like flies," and then, using sign language, he spelled out Hardy's daughter's name, which Hardy interpreted as a threat toward her daughter. Hardy denied ever having spoken to anyone at Sonic and saying that Armstrong was not the shooter. She also denied having ever told Johnny, Jackie, or Vidal that she was the shooter. While Hardy was on the stand, the State read notes from Hardy's counselor where the counselor wrote that Hardy had told her that Armstrong had murdered someone in front of her, that she was going to testify about the events in court, and that she feared that Armstrong would have her killed.

20

## F. The Investigation

Texas Ranger James Holland testified that he interviewed Armstrong on March 2, 2018, after Armstrong was in custody. The State published the interview for the jury. In the interview, Armstrong claimed that Dunlap had "tossed" him the gun and that it "went off." Armstrong said that after that, he "freaked out" because there were drugs in the house, and he left. Armstrong persisted that he had no reason to be upset with Dunlap because Dunlap was doing him a favor by offering to drive Hardy to Sonic. And Armstrong said repeatedly that what happened was an accident. According to Armstrong, he and Dunlap were the only people in the room when the shooting occurred, and Hardy was the first to come into the room afterwards, and then she ran out the door. Armstrong said that Johnny and Jackie then came out and "everyone was freaking out wondering what to do." Armstrong stated that he then ran out of the house in pursuit of Hardy. Armstrong went back into the house, told Johnny to call for help, gathered some of the methamphetamine that was there, and then got "the hell out of there."

Holland testified that, after the interview, he did not believe Armstrong's version of the events. Holland averred that, given the safety features and mechanics of the gun used, it would have been impossible for Dunlap to have been shot in the fashion that Armstrong described. Holland also said that during the interview, Armstrong gave varying stories regarding where Hardy and Dunlap were when the

21

shooting occurred. During the interview, Armstrong stated several times that he "was going . . . down for murder."

Sergeant Timothy Lamkin of the Wise County Sheriff's Office testified that he examined Armstrong's Expedition after it had been impounded. Lamkin said that he found traces of blood in the vehicle. He also examined the .38 that Yates discovered at the scene and found it odd that the barrel was clogged with dirt. Lamkin said that the presence of dirt in the barrel of the gun indicated that the dirt had lodged in the barrel after the gun had been fired. Lamkin stated that the lack of DNA present on the gun indicated that the gun had been "wiped down" after having been fired. Lamkin was able to confirm that the .38 that he tested was the same gun that fired the shot that killed Dunlap.

Juan Rojas, a trace examiner for the Texas Department of Public Safety crime lab in Austin, testified that based on his observations and testing, "[t]wo characteristics of gunpowder residue particles were confirmed on the hands of . . . Hardy." According to Rojas, these particles were found on both Hardy's left and right hands. And Rojas said that the presence of these particles indicated that Hardy had "fired the weapon or had been in the immediate proximity where [the] weapon was fired [or she had] come into contact with . . . a surface that contained those type of particles." Using a demonstrative aid, the prosecutor asked if the shooter had been in one general area in the house when the gun was fired and Hardy had been in a nearby area, would that explain the presence of residue on her hands. Rojas replied,

> Anything that's in the path of where the bullet is going or where the majority of the blast that's coming out of the barrel of a weapon is gonna be exposed. As far as the distance, it depends on the ammunition and the weapon. So if a weapon was fired in that direction that he just pointed out, then my initial analysis of this would be those areas are in the path, so it's a possibility, yes.

Rojas said that no gunshot residue was found on Johnny and that "one characteristic gunshot primer residue particle" was "confirmed" on Jackie.

## G. The Verdict and the Punishment Phase

A jury found Armstrong guilty of murdering Dunlap. Armstrong elected to have the trial court assess punishment. After the close of evidence at the punishment phase, the trial court stated, "[S]ometimes judges hear closing arguments as to punishment. I am -- I don't wish to hear it today." Neither Armstrong nor his attorney objected, and neither Armstrong nor the State gave closing arguments. The trial court then assessed Armstrong's punishment at life in prison. This appeal followed.

## III. DISCUSSION

## A. Sufficiency of the Evidence

In his fourth issue, Armstrong argues that the evidence is insufficient to support his conviction. Specifically, Armstrong argues that Hardy confessed to three people that she had shot Dunlap; the State failed to demonstrate he had a motive to kill Dunlap; his flight was evidence of his methamphetamine-induced paranoia rather than evidence of his guilt; and the State failed to prove he intended to kill Dunlap.

The State counters that the evidence supports the jury's verdict that Armstrong was the shooter; there was sufficient evidence regarding Armstrong's motive; the evidence of Armstrong's attempts to evade the police indicated that he was conscious of his own guilt; and the cumulative force of all the evidence established that Armstrong intended to murder Dunlap. We agree with the State.

### 1. Standard of Review

When reviewing whether sufficient evidence supports a conviction, we look at all of the evidence in the light most favorable to the jury's verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the

verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins*, 493 S.W.3d at 599; *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

25

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599. We must scrutinize circumstantial evidence of intent as we do other elements of an offense. *Laster v. State*, 275 S.W.3d 512, 519–20 (Tex. Crim. App. 2009). But when a record supports conflicting inferences, we "must presume— even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

### 2. Law of Murder

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b).

### 3. Analysis

In this case, the evidence, when viewed in a light most favorable to the jury's verdict, sufficiently supports that Armstrong intentionally shot and killed Dunlap. The evidence supporting Armstrong's conviction falls into several categories described below.

26

*a. Hardy Witnessed the Shooting*

Some of the most compelling evidence supporting that Armstrong murdered Dunlap is that Hardy witnessed the shooting and told others what she had seen. Hardy testified that Dunlap had offered her a ride to Sonic and that when she returned from gathering her purse from the bedroom, she walked into the living room, and Armstrong told her to shut the front door. When Hardy refused, Armstrong shut the door. According to Hardy, Armstrong then pulled a gun from his waistband, pointed it at Dunlap's head, and pulled the trigger. Hardy's testimony that Armstrong was the shooter alone is sufficient to support the jury's verdict. *See Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971) (concluding that the testimony of a single eyewitness is sufficient to support the jury's verdict); *see also Bundick v. State*, No. 14-12-00568-CR, 2013 WL 1352339, at *2 (Tex. App.—Houston [14th Dist.] Apr. 4, 2013, no pet.) (mem. op., not designated for publication) (citing *Aguilar* for the proposition that the testimony of one eyewitness is sufficient to support jury's verdict of murder).

Hardy's version of the shooting is supported by the fact that in the immediate aftermath of the shooting, multiple neighbors heard Hardy tell either Dunlap's mother or the police that Armstrong had shot Dunlap. One neighbor, Comer, recalled how Hardy had told police that Armstrong had argued with Dunlap about giving her a ride to Sonic and that was why Armstrong had shot Dunlap. Comer also said that Jackie recalled how Hardy had stated that Armstrong shot Dunlap over an argument about

27

giving Hardy a ride to Sonic. Yates said that when he spoke with Hardy a second time, she told him that Armstrong had shot Dunlap.

Armstrong argues that because Vidal, Johnny, and Jackie all testified that Hardy had told them that Armstrong was not the shooter, and because Vidal, Johnny, and Jackie all testified that they were sober at the time Hardy allegedly told them that Armstrong was not the shooter, the evidence suggests that Hardy was in fact the shooter and not Armstrong. But Hardy testified that she never told any of these witnesses that she was the shooter or that Armstrong was not the shooter. And the jury was free to believe Hardy's testimony and to disbelieve the testimony of Vidal, Johnny, and Jackie. *See* Tex. Code Crim. Proc. Ann. art. 38.04 ("The jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given to the testimony . . . ."); *Queeman*, 520 S.W.3d at 622.

### b. Armstrong's Flight

There is also substantial evidence in the record that Armstrong fled the murder scene and attempted to evade discovery by police. Multiple law enforcement officers and other witnesses testified how they were able to trace Armstrong's path from the Brush Street residence to the site where Armstrong crashed his Expedition. From there, officers were able to track Armstrong's path to the quarry shop where he stole the boots, coveralls, and a hardhat. They were then able to track him to the abandoned trailer and ultimately to the truck stop where he was found hiding under the trailer of an 18-wheeler prior to being apprehended. And Armstrong told police

28

to shoot him when they apprehended him, and he told Yates multiple times that he was "going down for murder." A reasonable inference from these actions and statements is that Armstrong knew he was guilty of murder and did not want to be arrested, so this evidence of flight supports the jury's verdict. *See Burks v. State*, 876 S.W.2d 877, 903 (Tex. Crim. App. 1994).

Armstrong argues that his flight is evidence that he is a paranoid person and not an indication that he was guilty of Dunlap's murder. The jury, however, was free to interpret Armstrong's fleeing actions as inferring his guilt of having shot Dunlap. *See id.* ("Evidence of flight is admissible as a circumstance from which an inference of guilt may be drawn."). Citing *Cawley v. State*, Armstrong also argues that flight alone is insufficient to sustain his conviction. 310 S.W.2d 340, 342 (1957). But as explained above and below, there is more evidence of Armstrong's guilt than just his flight.

### c. Armstrong's Varying and Implausible Stories

The jury was also presented with evidence that Armstrong gave varying stories to different people about how Dunlap was shot. He told Bentley that Dunlap had accidently shot himself, and he told Johnny and Holland that Dunlap had tossed him (Armstrong) the gun and that it accidently fired and shot Dunlap. Moreover, Holland determined during his interview of Armstrong that Armstrong's description of where each person was standing when Dunlap was shot was inconsistent and implausible. Holland also said that Armstrong's explanation that the gun went off accidently when he caught it was inconsistent with the safety features on the gun. This evidence also

29

supports the jury's verdict. *See Lozano v. State*, 359 S.W.3d 790, 814 (Tex. App.—Fort Worth 2012, pet. ref'd) ("[H]is inconsistent statements and implausible explanations indicate guilt, and that additional evidence supports the jury's finding of guilt.").

### d. *Armstrong's Motive*

Armstrong also argues that the State failed to demonstrate that he had a motive to kill Dunlap. Although the State did not need to prove motive in order to convict Armstrong of murder, evidence of motive is circumstantial evidence tending to show guilt, and the State put on two theories of motive that are supported by the evidence. *See Clayton v. State*, 235 S.W.3d 772, 781 (Tex. Crim. App. 2007) (recognizing that although motive is not an element of murder, it may be a circumstance that is indicative of guilt).

First, the State put on evidence that Armstrong was suspicious that Dunlap might have been working for the police. Smith testified that there were rumors that Dunlap had been released early because he had provided information on other people to the police. Hardy recalled that she and Armstrong had discussed that Dunlap was an undercover informant. And Jackie said that Armstrong had asked him whether Dunlap was working for the police. The jury was free to make the reasonable inference from this evidence that Armstrong was paranoid that Dunlap was working for the police and that Armstrong shot Dunlap because of this belief.

Second, the record also indicates that Armstrong was jealous that Dunlap had offered Hardy a ride to Sonic. Multiple witnesses testified that Armstrong was jealous

30

of Hardy being alone with other men. And multiple witnesses expressed that Hardy had said that the reason that Armstrong shot Dunlap is because Armstrong had gotten into an argument with Dunlap because he had offered to give Hardy a ride to Sonic. The jury was entitled to see these motives as circumstantial evidence tending to show Armstrong's guilt. *See id.*

### e. Armstrong's Handling of the Gun after the Shooting

Armstrong also argues that the "investigation revealed no fingerprints on the gun, no significant primer residue on any suspects' hands, and no other objective evidence to identify the shooter." But the State put on evidence from which the jury could have reasonably inferred that Armstrong had the gun used to shoot Dunlap immediately after Dunlap had been shot.

Yates said that he found the gun on a love seat when he arrived at the scene. Moreover, multiple witnesses testified that Armstrong had pursued Hardy and then returned inside the house. Lamkin explained that he had found dirt clogged in the barrel of the gun and that the dirt could only have gotten there after the gun had been fired. A reasonable inference from this evidence is that Armstrong had the gun on him as he pursued Hardy, that while outside Armstrong somehow caused dirt to be lodged in the barrel of the gun, and that Armstrong then returned to the house and left the gun inside.

Lamkin also stated that the gun had been "wiped down," which explained why no one's fingerprints were found on the gun and is consistent with why there would

31

be dirt clogged in the barrel of the gun but no dirt found on the outside of the gun. A reasonable inference from the fact that the gun had been wiped down is that Armstrong was attempting to reduce the likelihood that he would be connected to the gun, and thus, to Dunlap's murder. *See Hedrick v. State*, 473 S.W.3d 824, 830 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("Acts that are designed to reduce the likelihood of prosecution, conviction, or incarceration for the offense on trial are admissible . . . as showing 'consciousness of guilt.'"). Armstrong's handling of the gun after Dunlap's murder is additional evidence supporting the jury's verdict.

### f. Armstrong's Intent

Despite Armstrong's contention to the contrary, the cumulative force of all the evidence presented to the jury supports that Armstrong intended to murder Dunlap. In determining whether intent to kill was proven, the jury can use its collective common sense and may apply common knowledge and experience. *See Rodriguez v. State*, 90 S.W.3d 340, 355 (Tex. App.—El Paso 2001, pet. ref'd).

The jury may infer the intent to kill from any evidence that it believes proves the existence of that intent. *Brown*, 122 S.W.3d at 800. Intent can be inferred from such circumstantial evidence as the person's acts, words, and conduct because "[o]ne's acts are generally reliable circumstantial evidence of one's intent." *Laster v. State*, 275 S.W.3d 512, 524 (Tex. Crim. App. 2009); *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). The jury may also infer intent to kill from the defendant's use of a deadly weapon, such as a gun, unless it would be unreasonable to infer that death or

32

serious bodily injury could result from the particular use of the weapon. *Brown*, 122 S.W.3d at 800–01; *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996).

As explained above, the jury had before it evidence of Armstrong's flight, his varying and implausible stories about how Dunlap was shot, his motives for shooting Dunlap, and his handling of the gun after Dunlap was shot, including the fact that the gun had been wiped off after the shooting. These acts, words, and conduct are all reliable, circumstantial evidence from which the jury could have inferred Armstrong's intent. *See Laster*, 275 S.W.3d at 524. Moreover, the jury heard testimony that Armstrong shot Dunlap with a gun and was entitled to infer Armstrong's intent to kill Dunlap by the use of the deadly weapon. *See Brown*, 122 S.W.3d at 800–01; *see also Ex parte Poe*, 751 S.W.2d 873, 875 (Tex. Crim. App. 1988) ("[A] handgun is a deadly weapon per se . . . .").

We conclude that a rational factfinder could have found that Armstrong's conscious objective was to cause Dunlap's death or that Armstrong was aware that his shooting Dunlap was certain to cause Dunlap's death. *See* Tex. Penal Code Ann. §§ 6.03(a), (b); *Queeman*, 520 S.W.3d at 622. We overrule Armstrong's fourth issue.

## B. No Closing Arguments at Punishment

In his first and second issues, Armstrong argues that the trial court reversibly erred by not allowing counsel to make closing arguments during the punishment phase at trial and that he was egregiously harmed by the trial court's ruling. The State

argues that Armstrong has failed to preserve these issues for our review. We agree with the State.

A trial court abuses its discretion by denying counsel the right to make a closing argument. *See Ruedas v. State*, 586 S.W.2d 520, 524 (Tex. Crim. App. [Panel Op.] 1979). But this court has consistently held that to preserve error, counsel must have notified the trial court of the desire to present closing argument, the trial court must have refused that request, and counsel must have asserted a timely objection to the trial court's ruling denying closing argument. *See Riddle v. State*, No. 02-14-00180-CR, 2014 WL 5409550 at *7 (Tex. App.—Fort Worth Oct. 23, 2014, pet. ref'd) (mem. op., not designated for publication); *Collum v. State*, Nos. 02-13-00395-CR, 02-13-00396, 2014 WL 4243700, at *1 (Tex. App.—Fort Worth Aug. 28, 2014, no pet.) (mem. op., not designated for publication); *Crane v. State*, No. 02–08–00122–CR, 2009 WL 214195, at *1 (Tex. App.—Fort Worth Jan. 29, 2009, no pet.) (per curiam) (mem. op., not designated for publication); *see also* Tex. R. App. P. 33.1.

In this case, after the trial court announced that it would not entertain closing arguments during the punishment phase of trial, neither Armstrong nor his attorney lodged an objection. Thus, Armstrong has failed to preserve his first and second issues for our review, and we overrule them. *See* Tex. R. App. P. 33.1.

## C. Ineffective Assistance of Counsel

In his third issue, Armstrong argues that his counsel was ineffective for failing to object to the trial court's not allowing closing arguments at the punishment phase. We conclude that the record does not support an ineffective-assistance-of-counsel claim.

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel. *Ex parte Scott*, 541 S.W.3d 104, 114 (Tex. Crim. App. 2017); *see* U.S. Const. amend. VI. To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that trial counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013). The record must affirmatively demonstrate that the claim has merit. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong. *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

When evaluating counsel's effectiveness under the *Strickland* deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307; *Thompson*, 9 S.W.3d at 813–14. Our review of counsel's

representation is highly deferential, and we indulge a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08. In fact, "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 446 U.S. at 689, 104 S. Ct. at 2064 (quoting *Michael v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 164 (1955)).

An appellate court may not infer ineffective assistance solely from an unclear record or a record that does not show why counsel failed to do something. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012); *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593. If trial counsel did not have that opportunity, we should not conclude that counsel performed deficiently unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308. Given the high bar for establishing ineffective assistance, direct appeal is usually inadequate for raising an ineffective-assistance-of-counsel claim because the record typically does not show counsel's reasons for any alleged deficient performance. *See Mansfield*, 363 S.W.3d at 592–93; *Thompson*, 9 S.W.3d at 813–14. Accordingly, an application for a writ of habeas corpus is often the more appropriate vehicle to raise ineffective-assistance-of-counsel claims. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003).

In the present case, Armstrong did not file a motion for new trial predicated on ineffective assistance of counsel; thus, the record is silent as to why trial counsel did not attempt to present a closing argument or object to the absence of an opportunity to do so at the punishment hearing. Therefore, under the presumption that trial counsel's actions could be considered sound trial strategy,[4] we cannot conclude that Armstrong has established that trial counsel's performance was so deficient as to deprive him of his constitutional right to effective assistance of counsel based on the total record. *See Strickland*, 446 U.S. at 689, 104 S. Ct. at 2064–65. Because Armstrong has not satisfied the first prong of *Strickland*, we need not consider any arguments concerning potential harm that might have been caused by deficient performance. *Williams*, 301 S.W.3d at 687. Accordingly, we overrule Armstrong's third issue.

## IV. CONCLUSION

Having overruled all four of Armstrong's issues on appeal, we affirm the trial court's judgment.

---

[4]The State argues that there are several strategic reasons why an attorney would choose not to object to the trial court stating it would not entertain closing arguments at punishment. They include that (1) defense counsel could have believed the trial court was typically more lenient at punishment, (2) defense counsel may have wanted to avoid the prosecutor's effectiveness at closing arguments, (3) the State had considerably more facts to work with in closing than the defense, and (4) defense counsel may have wanted to let their witnesses' testimony be the last thing the trial court heard before assessing punishment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  September 17, 2020